Robert C. Schubert #62684
Willem F. Jonckheer #178748
Amber L. Schubert #278696
Sonum Dixit #353395
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law
aschubert@sjk.law
sdixit@sjk.law

*Attorneys for Plaintiffs and the Proposed Classes*

Christian Levis (*pro hac vice* forthcoming)
Amanda Fiorilla (*pro hac vice* forthcoming)
Patricia Zapata Latzer (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
platzer@lowey.com

*Additional Plaintiffs' Counsel Listed Below*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CORINNE PEARSON, SIRATUL MUSTAKIM, KEN ZHU, GREGORY RITTENHOUSE, ROBERT SMITH, NINA AIMONE, AND STEPHEN CANNON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HIMS & HERS HEALTH, INC.,<br><br>Defendant. | Case No.: 3:26-cv-8470<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Corinne Pearson, Siratul Mustakim, Ken Zhu, Gregory Rittenhouse, Robert Smith, Nina Aimone, and Stephen Cannon, individually and on behalf of all others similarly situated, assert the following against Defendant Hims & Hers Health, Inc. ("Defendant" or "Hims & Hers"), based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

**SUMMARY OF ALLEGATIONS**

1. Hims & Hers operates a consumer-facing health and wellness platform through which consumers can connect to licensed healthcare professionals, receive telehealth services, prescription health and wellness products, and tailored treatment plans.[1]

2. Consumers can access these services through Hims & Hers websites (available at https://www.forhers.com/ and https://www.hims.com/) and mobile applications (collectively, the "Hims & Hers Platform").

3. Receiving medical treatment, and prescriptions, through the Hims & Hers Platform mirrors the process at "an in-person doctor's office."[2] It begins with an "intake process" (the "Intake Flow") in which consumers/patients must disclose "their symptoms, health history, and treatment goals" through an online questionnaire, as well as complete an "identity verification process."[3]

4. The results of this Intake Flow are reviewed by a "licensed healthcare provider" who then issues a prescription for the consumer/patient if necessary.[4]

5. A primary selling point of Hims & Hers's services is that they are "discreet[]" including in how they ship prescriptions directly to consumers.[5] After receiving their prescription, consumers/patients can continue communicating with their "care team" on the Hims & Hers Platform.[6]

6. Hims & Hers has also assured consumers that Hims & Hers's Platform offers consumers a "100% online, private, and secure" process and that consumers' sensitive health information would only be accessed by Hims & Hers's medical providers—leading consumers to

---

[1] *About the company: Hims & Her*s, HIMS & HERS, https://www.hims.com/about/the-company (last visited August 13, 2026).
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.*

believe that Hims & Hers would not disclose consumers' personal private information, including their sensitive, protected health information and data (collectively, "PHI").[7]

7. Given the nature of this information shared through the Hims & Hers Platform, Plaintiffs and Class Members believed their PHI would not be shared or disclosed.

8. Unbeknownst to Plaintiffs and Class Members, this PHI communicated through the Hims & Hers Platform, including health information relating to the completion of the medical intake forms, was disclosed to and intercepted by some of the largest advertising and social media companies in the country, including Meta Platforms, Inc. ("Meta"), Google, LLC ("Google"), Snap Inc. ("Snap"), and Amplitude, Inc. ("Amplitude").

9. Hims & Hers disclosed, and allowed third parties to intercept, this PHI through tracking technology incorporated on the Hims & Hers Platform, including software development kits ("SDK") and tracking pixels (collectively, "Tracking Technologies"). Hims & Hers incorporated this Tracking Technology from a number of third parties—which itself demonstrates this was not by accident—including, in addition to the above, Pinterest, Inc., Microsoft Corporation, through its Bing services, Datadog, Inc., Reddit, Inc., Stripe, Inc., Branch Metrics, Inc., and Braze, Inc. (collectively, the "Advertising and Analytics Companies").

10. This information was not aggregated or deidentified, nor were the Advertising and Analytics Companies prohibited from using this information for their own benefit. For instance, Google, Meta, and Snap use this information for their own purposes, including to train their own ad delivery and personalization systems.

11. Each of the Plaintiffs and Class Members provided their personal information, including health data relating to their medical conditions and medication history, to Hims & Hers with the expectation that this information would remain confidential and private.

---

[7] *See Federal Trade Commission v. Hims & Hers Health, Inc.*, No. 3:26-cv-7871, Complaint, ECF No. 1 at ¶ 7 (N.D. Cal. July 29, 2026).

12. As if disclosing PHI was not bad enough, Hims & Hers has also misled millions of consumers by charging them for unwanted prescription medication subscriptions without their express informed consent. Plaintiffs did not consent to the interception or disclosure of their PHI to the Advertising and Analytics Companies, nor could they because Hims & Hers never obtained valid HIPAA authorization to disclose that information.

13. Hims & Hers's advertising and online medical intake forms mislead consumers that, when submitting their intake questionnaire in the Intake Flow for review by a medical provider, they were not obligated to purchase or subscribe to the provider's recommended treatment. Hims & Hers's advertising and medical intake forms also misrepresent that consumers can consult with Hims & Hers's medical providers about their treatment recommendations free of charge in order to determine whether a treatment is "right" for them.

14. Contrary to Hims & Hers's representations, it routinely charges consumers for prescription treatments and enrolls them in subscription plans for those treatments immediately after receiving consumers' medical intake forms—this is true even after expressly representing on the check-out screen that $0 is due today. Consumers have virtually no opportunity to review the provider's recommended treatment, much less consent to it. Accordingly, consumers, such as Plaintiffs Smith, Aimone, and Cannon, have suffered, and continue to suffer, significant injury by being forced to pay for medical treatment that they did not consent to or wish to purchase. Despite years of receiving complaints from consumers about their lack of consent, Hims & Hers has continued to use misleading language in its advertising and intake forms and has continued to immediately charge consumers without their express informed consent. The same practice also caused consumers to face unwanted refill charges, as they continued to be billed for treatment they never agreed to.

15. First, Hims & Hers fails to clearly and conspicuously disclose to consumers the dates upon which they will face recurring charges for refills in their subscription. As a result, consumers

without notice of Hims & Hers's refill charge dates have missed deadlines to avoid refill charges and have been forced to pay for refills of medications that they did not want.

16. Second, Hims & Hers purposefully made it difficult for consumers to cancel their subscriptions. For years, consumers struggled to successfully cancel and stop recurring charges because of the methods of cancellation Hims & Hers offered, which resulted in failed cancellation attempts, lost time, and unwanted charges. Despite being aware of consumers' struggles, Hims & Hers repeatedly chose not to provide simple mechanisms for consumers to stop recurring charges for medications they no longer want.

17. This conduct—deceptive subscription enrollment, non-disclosure of recurring refill billing dates, and an obstructive, multi-step cancellation flow—independently violates California's Consumers Legal Remedies Act, California's False Advertising Law, California's Unfair Competition Law (as predicated on California's Automatic Renewal Law and the federal Restore Online Shoppers' Confidence Act), and California common law, in addition to the privacy-based claims set forth below.

18. Those assurances were false or misleading. Instead of honoring its privacy promises, Hims & Hers opted to grow the company and increase its revenue streams with Advertising and Analytics Companies.

19. The disclosure and interception of this PHI without consent constitutes an extreme invasion of Plaintiffs' and Class Members' privacy. Given the secret and undisclosed nature of Him & Hers's conduct, additional evidence supporting Plaintiffs' claims, including the full extent of medical information intercepted and how that information was used, will be revealed in discovery.

## PARTIES

### A. Plaintiffs

20. **Plaintiff Corinne Pearson** ("Plaintiff Pearson") is a citizen and resident of La Mesa, California.

21. Plaintiff Pearson used the Hims & Hers Platform to obtain healthcare services and/or prescriptions in approximately September 2024.

22. To use the Hims & Hers Platform, Plaintiff Pearson was required to disclose her name, email, address, and other personal information. She was also required to complete an online questionnaire in the Intake Flow, in which she communicated to Hims & Hers information about her symptoms and medication history.[8] Plaintiff Pearson paid for these services.

23. Unbeknownst to Plaintiff Pearson, Hims & Hers disclosed, and the Advertising and Analytics Companies intercepted, this information, including her PHI on the Hims & Hers Platform.

24. Plaintiff Pearson did not consent to the sharing and/or interception of her data, or the use of this PHI by Hims & Hers or Advertising and Analytics Companies, nor could they because Hims & Hers never obtained valid HIPAA authorization to disclose that information. Had Plaintiff Pearson known Hims & Hers would share her PHI with third parties, including for advertising and other undisclosed purposes, she would never have used the website or shared her PHI with Hims & Hers.

25. **Plaintiff Siratul Mustakim** ("Plaintiff Mustakim") is a citizen and resident of Pine Hills, Florida.

26. Plaintiff Mustakim used the Hims & Hers Platform to obtain healthcare services and/or prescriptions.

27. To use the Hims & Hers Platform, Plaintiff Mustakim was required to disclose his name, email, address, and other personal information. He was also required to complete an online questionnaire in the Intake Flow, in which he communicated to Hims & Hers information about his symptoms and medication history.

[8] Plaintiffs each used Hims and/or Hers to receive treatment for a specific medical condition. In order to preserve the privacy of that information, Plaintiffs are not pleading the details of their conditions, which Defendant will learn in discovery after entry of an appropriate HIPAA qualified protective order.

28. Unbeknownst to Plaintiff Mustakim, Hims & Hers disclosed, and the Advertising and Analytics Companies intercepted, this information, including his PHI on the Hims & Hers Platform.

29. Plaintiff Mustakim did not consent to the sharing and interception of his data, or the use of this PHI by Hims & Hers or Advertising and Analytics Companies, nor could they because Hims & Hers never obtained valid HIPAA authorization to disclose that information. Had Plaintiff Mustakim known Hims & Hers would share his PHI with third parties, including for advertising and other undisclosed purposes, he would never have used the website or shared his PHI with Hims & Hers.

30. **Plaintiff Ken Zhu** ("Plaintiff Zhu") is a citizen and resident of San Francisco, California.

31. Plaintiff Zhu used the Hims & Hers Platform to obtain healthcare services and/or prescriptions.

32. To use the Hims & Hers Platform, Plaintiff Zhu was required to disclose his name, email, address, and other personal information. He was also required to complete an online questionnaire in the Intake Flow, in which he communicated to Hims & Hers information about his symptoms and medication history. Plaintiff Zhu paid for these services.

33. Unbeknownst to Plaintiff Zhu, Hims & Hers disclosed, and the Advertising and Analytics Companies intercepted, this information, including his PHI on the Hims & Hers Platform.

34. Plaintiff Zhu did not consent to the sharing and interception of his data, or the use of this PHI by Hims & Hers or Advertising and Analytics Companies, nor could they because Hims & Hers never obtained valid HIPAA authorization to disclose that information. Had Plaintiff Zhu known Hims & Hers would share his PHI with third parties, including for advertising and other undisclosed purposes, he would never have used the website or shared his PHI with Hims & Hers.

35. **Plaintiff Gregory Rittenhouse** ("Plaintiff Rittenhouse") is a resident of West Islip, New York.

36. Plaintiff Rittenhouse used the Hims & Hers Platform to obtain healthcare services and/or prescriptions.

37. To use the Hims & Hers Platform, Plaintiff Rittenhouse was required to disclose his name, email, address, and other personal information. He was also required to complete an online questionnaire in the Intake Flow, in which he communicated to Hims & Hers information about his symptoms and medication history. Plaintiff Rittenhouse paid for these services.

38. Unbeknownst to Plaintiff Rittenhouse, Hims & Hers disclosed, and the Advertising and Analytics Companies intercepted, this information, including his PHI on the Hims & Hers Platform.

39. Plaintiff Rittenhouse did not consent to the sharing and interception of his data, or the use of this PHI by Hims & Hers or Advertising and Analytics Companies, nor could they because Hims & Hers never obtained valid HIPAA authorization to disclose that information. Had Plaintiff Rittenhouse known Hims & Hers would share his PHI with third parties, including for advertising and other undisclosed purposes, he would never have used the website or shared his PHI with Hims & Hers.

40. **Plaintiff Robert Smith** ("Plaintiff Smith") is a citizen and resident of Fresno, California.

41. Plaintiff Smith used the Hims & Hers Platform to obtain healthcare services and/or prescriptions.

42. To use the Hims & Hers Platform, Plaintiff Smith was required to disclose his name, email, address, and other personal information. He was also required to complete an online questionnaire in the Intake Flow, in which he communicated to Hims & Hers information about his symptoms and medication history. Plaintiff Smith paid for these services.

43. Unbeknownst to Plaintiff Smith, Hims & Hers disclosed, and the Advertising and Analytics Companies intercepted, this information, including his PHI on the Hims & Hers Platform.

44. Plaintiff Smith did not consent to the sharing and interception of his data, or the use of this PHI by Hims & Hers or Advertising and Analytics Companies, nor could they because Hims & Hers never obtained valid HIPAA authorization to disclose that information. Had Plaintiff Smith known Hims & Hers would share his PHI with third parties, including for advertising and other undisclosed purposes, he would never have used the website or shared his PHI with Hims & Hers.

45. In addition to the conduct described above, Plaintiff Smith is also a victim of Hims & Hers's deceptive subscription enrollment, billing, and cancellation practices. Plaintiff Smith sought medical treatment through the Hims & Hers Platform. In or around 2023, using his personal phone while residing in California, Plaintiff Smith completed a Hims & Hers questionnaire. At checkout, Hims & Hers's Intake Flow represented that $0 was "due today," conveying that Plaintiff Smith would not be charged before speaking with or being evaluated by a medical provider.

46. In fact, Plaintiff Smith was charged approximately $300 for a monthly prescription without ever speaking with or being evaluated by a medical provider, and the amount charged did not match Hims & Hers's advertising or what Plaintiff Smith had understood he was agreeing to pay. Plaintiff Smith subsequently attempted to cancel his subscription; Hims & Hers did not acknowledge or process that request, requiring Plaintiff Smith to submit a second cancellation request, and Hims & Hers charged Plaintiff Smith again notwithstanding his attempt to cancel. Plaintiff Smith did not succeed in canceling his subscription until mid-2025.

47. Like with all other Class Members, the Intake Flow presented to Plaintiff Smith did not state that completing his Intake Flow constituted a binding agreement to be charged and enrolled in an automatically renewing subscription before he had an opportunity to review or consent to a recommended treatment, and Hims & Hers did not provide Plaintiff Smith with a simple mechanism to stop his recurring charges once he sought to cancel. Had Plaintiff Smith

known that completing his Intake Flow would result in an immediate binding charge without ever speaking with a provider, or had Hims & Hers honored his cancellation request the first time he made it, he would not have been charged for treatment on the terms Hims & Hers actually applied, and would have stopped being charged sooner than he was.

48. **Plaintiff Nina Aimone** ("Plaintiff Aimone") is a citizen and resident of Coos Bay, Oregon.

49. Plaintiff Aimone used the Hims & Hers Platform to obtain healthcare services and/or prescriptions.

50. To use the Hims & Hers Platform, Plaintiff Aimone was required to disclose her name, email, address, and other personal information. She was also required to complete an online questionnaire in the Intake Flow, in which she communicated to Hims & Hers information about her symptoms and medication history. Plaintiff Aimone paid for these services.

51. Unbeknownst to Plaintiff Aimone, Hims & Hers disclosed, and the Advertising and Analytics Companies intercepted, this information, including her PHI on the Hims & Hers Platform.

52. Plaintiff Aimone did not consent to the sharing and interception of her data, or the use of this information by Hims & Hers or Advertising and Analytics Companies. Had Plaintiff Aimone known Hims & Hers would share her PHI with third parties, including for advertising and other undisclosed purposes, she would never have used the website or shared her PHI with Hims & Hers.

53. In addition to the conduct described above, Plaintiff Aimone was also subjected to Hims & Hers's deceptive subscription enrollment, billing, and cancellation practices. Plaintiff Aimone sought medical treatment through the Hims & Hers Platform. Earlier this year, using her personal phone, Plaintiff Aimone completed a Hims & Hers intake questionnaire. At checkout, Hims & Hers's Intake Flow represented that there would be a $39 subscription fee, conveying that

Plaintiff Aimone would only receive a bill for the subscription due and not for services rendered or the prescription.

54. Plaintiff Aimone went to check out upon receiving her "diagnosis" and was met with a charge of $236, a very steep increase from the $39 subscription fee she was promised in advertising for the service she required. She contacted customer service and after a lengthy discussion was able to pay the promised $39 to begin her subscription. Because of this she tried to cancel her subscription, but was ignored on her first attempt. She recalls contacting Hims & Hers customer service multiple times over several days, until finally Hims & Hers canceled her subscription and retained the $39 charge notwithstanding her attempt to cancel.

55. **Plaintiff Stephen Cannon** ("Plaintiff Cannon") is a citizen and resident of Glendale, California.

56. Plaintiff Cannon used the Hims & Hers Platform to obtain healthcare services and/or prescriptions.

57. To use the Hims & Hers Platform, Plaintiff Cannon was required to disclose his name, email, address, and other personal information. He was also required to complete an online questionnaire in the Intake Flow, in which he communicated to Hims & Hers information about his symptoms and medication history. Plaintiff Cannon paid for these services.

58. Unbeknownst to Plaintiff Cannon, Hims & Hers disclosed, and the Advertising and Analytics Companies intercepted, this information, including his PHI on the Hims & Hers Platform.

59. Plaintiff Cannon did not consent to the sharing and interception of his data, or the use of this information by Hims & Hers or Advertising and Analytics Companies. Had Plaintiff Cannon known Hims & Hers would share his PHI with third parties, including for advertising and other undisclosed purposes, he would never have used the website or shared his PHI with Hims & Hers.

60. In addition to the conduct described above, Plaintiff Cannon is also a victim of Hims & Hers's deceptive billing practices. Plaintiff Cannon sought medical treatment through the Hims & Hers Platform. In or around April of 2023, using his personal phone while residing in California, Plaintiff Cannon completed a Hims & Hers intake questionnaire. At checkout, Hims & Hers's Intake Flow represented that $0 was "due today." Plaintiff Cannon was then prompted to enter his payment information before speaking with or being evaluated by a medical provider. Within an hour of being seen by a medical professional, Plaintiff Cannon was charged $180 for his prescription.

**B. Defendant**

61. Defendant Hims & Hers Health, Inc. is a publicly traded Delaware corporation with its principal place of business at 2269 Chestnut Street, #523, San Francisco, California.

62. Hims & Hers knowingly and intentionally incorporated a host of tracking technology for marketing, advertising, and analytics purposes on the Hims & Hers Platform without consumers' consent, including SDKs and tracking pixels.

63. The Advertising and Analytics Companies developed each of these tracking technologies for the express purpose of collecting data from users for, among other things, marketing, analytics, and advertising purposes.

64. Hims & Hers knew at the time it incorporated this software into the Hims & Hers Platform that it would result in the disclosure and interception of users' interactions on the Hims & Hers Platform, including PHI and other identifiable information, by virtue of how these technologies function and the analytics and insights they received as a result.

65. For example, Meta allows website and app developers, like Hims & Hers, to use the Meta Pixel and its SDK with access to the data collected from their users and provides them with tools and analytics to leverage that information to reach these individuals through Facebook ads.

66. Indeed, Hims & Hers created, at least, audiences with Meta on the Meta Platform that use health data disclosed to this entity. Accordingly, it was well aware of the data it disclosed and allowed the Advertising and Analytics Companies to intercept.

67. Despite this, Hims & Hers continued to incorporate the Advertising and Analytics Companies' technologies into the Hims & Hers Platform and reap their benefit, including by increasing its overall revenue through advertisements at the expense of Plaintiffs and Class Members' privacy. As such, Hims & Hers's conduct was intentional despite knowing the privacy violations it caused to Plaintiffs and Class Members.

## JURISDICTION AND VENUE

68. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative members of the Classes defined below, and a significant portion of putative Class Members are citizens of a state different from Hims & Hers.

69. This Court also has federal-question subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert a claim arising under the laws of the United States, namely the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq*.

70. This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

71. This Court has personal jurisdiction over Hims & Hers because its principal place of business is in California and a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in this State, including the interception and use of Plaintiffs' sensitive health data from the Hims & Hers Platform and use of that data for commercial purposes.

72. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d) because a substantial portion of the conduct described in this Class Action Complaint was carried out in

this District. Furthermore, Hims & Hers is headquartered in this District and subject to personal jurisdiction in this District.

73. **Divisional Assignment**: This action arises in San Francisco County, in that a substantial part of the events which give rise to the claims asserted herein occurred in San Francisco County. Pursuant to L.R. 3-2(d), all civil actions that arise in San Francisco County shall be assigned to the San Francisco or Oakland Division.

## FACTUAL BACKGROUND

### A. The FTC Complaint

74. On July 29, 2026, a partially redacted Complaint for Permanent Injunction, Monetary Judgment, Civil Penalty Judgment, and Other Relief was filed against Hims & Hers on behalf of the U.S. Federal Trade Commission ("FTC"), the People of the State of California, acting by and through Los Angeles County Counsel Dawyn R. Harrison, and the Utah Division of Consumer Protection (hereinafter, the "FTC Cmplt.").[9]

75. The FTC Complaint made numerous allegations of Hims & Hers's alleged privacy violations and consumer misrepresentations based on its investigation as described herein.

### B. The Hims & Hers Platform

76. Andrew Dudum, Jack Abraham, and Hilary Coles launched Hims & Hers[10] in 2017. It is now a publicly traded "telehealth platform" (NYSE: HIMS).[11] The "Hims" web and mobile properties are tailored to providing men's health treatment, whereas the "Hers" web and mobile properties are targeted at women.

77. Hims & Hers boasts that it provides a "comprehensive, personalized approach to healthcare, connecting customers with licensed healthcare providers who evaluate each

[9] *See Federal Trade Commission v. Hims & Hers Health, Inc.*, No. 3:26-cv-7871 (N.D. Cal. July 29, 2026).

[10] *About the company: Hims & Her*s, HIMS & HERS, https://www.hims.com/about/the-company (last visited August 14, 2026).

[11] *Id.*

individual's needs and recommend personalized treatment plans."[12] It provides access to telehealth services, consultations, and prescription medications through the Hims & Hers Platform. The types of health treatments and prescriptions available on the Hims & Hers Platform include erectile dysfunction and sexual health, hair loss, hormone health, weight loss, dermatology, mental health, and laboratory testing.[13]

78. Below, in **Figure 1**, is an example of the marketing materials on the Hims web property relating to testosterone treatment:

**FIGURE 1**




79. To obtain these telehealth services and/or a prescription, consumers/patients must complete an intake consultation (via the Intake Flow) that collects information about their symptoms, health history, and treatment goals.

80. The Intake Flow is divided into four parts. First, the consumer answers approximately 5 to 15 questions about the consumer's treatment interests and goals. Second, the

[12] *Id.*
[13] FORM 10-K, HIMS & HERS, https://www.sec.gov/Archives/edgar/data/1773751/000177375126000022/hims-20251231.htm?.

consumer registers with the Hims & Hers Platform by creating an account with personal login information. Third, the consumer completes a medical assessment consisting of between 25 and 50 questions about the consumer's medical history. Fourth, the consumer is shown a proposed treatment, along with its price and refill frequency, and is directed to enter billing and shipping information before submitting the Intake Flow for review by a medical provider (FTC Cmplt. ¶ 19).

81. The questionnaires in the Intake Flow are tailored to the specific type of health service sought by the consumer/patient, but each involves the collection and disclosure of health information.

82. For instance, as depicted in **Figure 2** below, the Hims & Hers Platform questionnaire for testosterone treatment asks, at least: (1) which areas of your health are you looking to improve?; (2) have you ever had your testosterone levels tested?; (3) When did you start noticing changes?; (4) how often do these changes get in the way of your day-to-day life?; (5) how do you feel about starting treatment?; (6) select the state you live in; (7) provide your date of birth.

**FIGURE 2**



83. After answering these questions, consumers/patients are prompted to create an account, providing their email address and password.

84. The questionnaire then continues, as depicted in **<u>Figures 3 and 4</u>** below, asking at least (1) are you currently being treated for low testosterone with prescription medication?; (2) if yes, why did you start testosterone treatment?; (3) symptoms; (4) whether they have lab results showing low testosterone; (5) what treatments they are currently taking for testosterone; (6) if they would like to switch treatment; (7) why they are interested in Hims; (8) do you have low sex drive; (9) difficulty getting or keeping a hard erection; (10) how they would rate how hard their erection is; (11) if their physical strength or endurance is lower than it should be; (12) if they need naps; (13) if they have low energy levels; (14) brain fog or feel less mentally sharp; (15) if they struggle with motivation; (16) have sad or depressed moods; (17) have thought, in the last two weeks, if they were better off dead or had thoughts of hurting themselves; (18) if they find preserving their fertility important; (19) are they able to walk briskly for 10 minutes or do light yard work without stopping because of physical symptoms; (20) had lightheadedness, fainting, or near fainting in the last six months; (21) enlargement of breast tissue from unrelated weight gain; (22) if they have been diagnosed or prescribed medication for heart conditions, high blood pressure, diabetes, high cholesterol, DVT or PE, blood clotting disorder, liver disease, hepatitis, abnormal liver test, eye problems, vision loss, unusual eye anatomy, endocrine system dysfunctions, or cancer; (23) whether they've been diagnosed or prescribed medication for an additional ten health conditions, such as sleep apnea or kidney problems; (24) if they have any other medical conditions; (25) if they take tadalafil every day; (26) if they've taken it in the past; (27) if they have an active prescription for erections or sexual function; (28) if they take oral finasteride or oral dutasteride currently or previously; (29) if they take vitamins or supplements; (30) if they take steroids or have in the last six months; (31) if they've taken recreational drugs in the past six months; (32) their height and weight; (33) if they have allergies; (34) if they had any surgeries or medical procedures; and (35) their sex at birth.

**FIGURE 3**

hims

**Are you currently being treated for low testosterone with prescription medication?**

This includes testosterone replacement therapy (TRT) and other medications to raise your testosterone levels, like clomiphene or anastrozole.

Yes

No

**FIGURE 4**




85. After completing this lengthy questionnaire, Hims & Hers summarizes the results and lets the consumer/patient know that a "licensed provider will review your symptoms and blood test results to find the right treatment for you," as shown in **Figure 5** below.

**FIGURE 5**




86. In the above example, after completing the questionnaire Hims & Hers recommended Testosterone Rx+ for $99/month if paid upfront for a ten-month plan. It then prompted the consumer/patient to provide their full name, address, and phone number to ship a test kit. Completing this process then triggers Hims & Hers's identity verification, which requires the last four digits of the consumer/patient's Social Security Number and a photo of their face or a copy of their ID.

87. After completing the entire process, the intake questions and answers, are reviewed by a licensed healthcare provider, as well as any required tests/labs, who can provide a prescription, where necessary, that is "discreetly" shipped directly to the consumer.[14]

88. Each of the telehealth/prescription services provided through Hims & Hers follows a similar format and requires the disclosure of health information.

**C. Hims & Hers Misleadingly Promises the Opportunity to Consult with a Medical Provider Regarding Treatment**

89. Hims & Hers has advertised its services and products extensively on social media, television, radio, and podcast programs. Since at least 2019, these advertisements have, in many instances, represented to consumers that the medical consultations provided via the Hims & Hers Platform are "free." FTC Cmplt. ¶ 20.

90. For example, Hims & Hers's online advertisements have frequently represented that Hims & Hers provides a "free consult" in which the consumer and a medical provider can "connect" to determine whether the consumer needs prescription medication and, if so, what medication should be prescribed. FTC Cmplt. ¶ 21.

91. Hims & Hers's offline advertisements (e.g., TV and radio) have contained similar representations promising consumers "free consultations." FTC Cmplt. ¶ 22.

92. Plaintiffs and Class Members who visit the Hims & Hers Platform have seen similar representations on the homepages of those platforms before seeking treatment.

93. For example, between at least 2021 and 2023, the Hims & Hers platform homepage advertised that Hims & Hers offered "[f]ree, expert consultation[s]" and "free online visit[s]" as part of its medical treatment service. FTC Cmplt. ¶ 23. From at least early 2023 to early 2024, this homepage similarly stated, "Your free online visit starts here," at the top of the page, with a call-to-action button under that statement inviting the consumer to "find [their] treatment." *Id.* Hers

[14] *About the company: Hims & Her*s, HIMS & HERS, https://www.hims.com/about/the-company (last visited July 30, 2026).

customers have seen similar representations on the Hers Platform homepage, such as representations promising consumers a "free assessment" by a medical provider. *Id.*

94. Hims & Hers's advertisements and webpages have also promised consumers that they can consult with a provider on the Hims & Hers Platform to find a treatment that is "right for them." FTC Cmplt. ¶ 24. For example, Hims & Hers has represented to consumers that, on the Hims & Hers Platform, they will be able to "connect with a licensed medical provider to get a customized care plan that's right for you" or "see if treatment is right for [them]." *Id.*

95. Once a consumer selects the type of medical treatment that they are interested in on the homepages of the Hims & Hers Platform, the consumer then typically starts the relevant Intake Flow, where they often see representations like those described above. These have included representations such as "Free provider diagnosis: A licensed medical provider will assess what you shared today to determine if treatment is right for you," "free provider evaluation," and "free assessment." FTC Cmplt. ¶ 25.

96. Then, toward the end of Hims & Hers's Intake Flow, Hims & Hers represents to consumers that no payment is required when they submit their information for review by a medical provider. FTC Cmplt. ¶ 26. For example, Hims & Hers's final call-to-action button has represented "Due Now - $0" and "Pay $0 today." *Id.*

97. In addition, these screens frequently assure consumers that, by submitting their Intake Flow for review by a provider, they are not yet agreeing to purchase any prescription, with statements such as "Save your payment details—you won't be charged until prescribed" and, in bolder text, "You will only be charged if prescribed." *Id.*

98. However, contrary to Hims & Hers's promises, Hims & Hers does not provide most consumers with the opportunity to consult with a provider. Instead, by submitting their Intake Flow, most consumers are unknowingly agreeing to pay for and subscribe to an as-yet-undetermined prescription treatment without having a chance to review the proposed treatment.

99. Specifically, after submitting their Intake Flow, most consumers do not actually receive a consultation with a medical provider, whether live or asynchronous. They cannot have a dialogue with the provider about the treatment recommendation, inquire about alternatives, elaborate on issues raised in the Intake Flow, reflect on whether the recommended treatment is "right for them," or ultimately agree to or decline to proceed with the prescription. FTC Cmplt. ¶ 27.

100. Instead, Hims & Hers's providers regularly and unilaterally prescribe a treatment without offering the consumer a consultation, at which point Hims & Hers immediately charges the consumer for the prescription, sends the prescription for fulfillment, and enrolls the consumer in a subscription treatment plan without receiving the consumer's express informed consent.[15] This practice affects consumers in most states because most states do not require real-time (synchronous) telehealth consultations. According to the FTC, in states without that requirement, contrary to its advertisements, Hims & Hers permits its providers to review consumers' Intake Flows and prescribe medications without any subsequent interaction with the consumer. Consequently, most consumers have already been charged for and enrolled in a subscription before they even learn what treatment the provider has recommended.

### D. Hims & Hers Fails to Clearly and Conspicuously Disclose If and When Consumers Will Be Charged and Subscribed and Thus Fails to Obtain Their Express Informed Consent

101. Hims & Hers requires, as the last step of the Intake Flow, that consumers provide Hims & Hers with their billing information. As described above, in most states, Hims & Hers charges consumers who are eligible for treatment immediately after a provider reviews their Intake Flow, chooses a treatment, and enrolls them in a subscription for the same. However, Hims &

[15] This practice affects consumers in most states because most states do not require real-time (synchronous) telehealth consultations. According to the FTC, in states without that requirement, contrary to its advertisements, Hims & Hers permits its providers to review consumers' Intake Flows and prescribe medications without any subsequent interaction with the consumer.

Hers's disclosures purporting to advise consumers of these practices before collecting their billing information have not been clear or conspicuous.

102. First, Hims & Hers's disclosures to consumers regarding its charging practices before collecting their billing information have not been clear. During the Intake Flow, Hims & Hers encourages consumers to "[s]ave your payment details" by reassuring them that they "won't be charged until prescribed." FTC Cmplt. ¶ 29.

103. Hims & Hers also leads consumers to conclude that submitting their Intake Flow is risk-free by prominently advertising "Due Now $0" and labeling the submission button with "Pay $0 today." *Id.* These vague and conditional statements are misleading because they fail to inform consumers that, upon submitting their Intake Flow, they are agreeing in advance to a binding charge and automatic subscription enrollment as soon as a provider recommends a treatment on the Hims & Hers Platform.

104. Second, Hims & Hers's disclosures to consumers regarding its charging practices before collecting their billing information have not been conspicuous. For example, while Hims & Hers has disclosed to consumers that "if prescribed medication, you are purchasing an automatically-renewing subscription," this disclosure is only in small, low-contrast font below the final call-to-action button that a consumer must press to submit their Intake Flow for review. FTC Cmplt. ¶ 30. Even if the consumer were to see this buried disclosure, it still uses the unclear "if prescribed" language, which creates ambiguity as to if and when that enrollment will occur. *Id.*

105. Hims & Hers has further consistently failed to clarify for consumers if and when they will be charged and subscribed after collecting consumers' billing information. Prior to 2025, following submission of the Intake Flow, consumers typically received notifications or saw website and in-app screens indicating the status of their submission. However, these notifications did not mention if or when a consumer would be charged at all. As a result, consumers remained unaware of whether or when they would incur their first charge.

106. As of late 2025, after learning of the FTC's investigation, Hims & Hers marginally improved the screen shown on the Hims & Hers Platform after a consumer submits their Intake Flow.

107. The screen now states in relevant part: "if approved, your prescription is charged to the card you provided and shipped to you directly." FTC Cmplt. ¶ 32. However, while this screen now uses the term "charge," it remains ambiguous as to when the "approval" and consequent "charge" occurs. *Id.*

108. For example, the screen states that, before approval, the "provider will message you shortly about your prescription [and] leave you a message in your account regarding your treatment," suggesting there is still an opportunity for a back-and-forth with the provider before any prescription is approved. *Id.*

109. Hims & Hers has been aware that consumers are often misled about whether and when Hims & Hers will charge them for their first order and enroll them in a subscription for prescription treatment.

110. For example, the company received numerous complaints about this issue from customers directly as well as through organizations such as the *Better Business Bureau*. Additionally, Hims & Hers's customer service and social media team monitored reviews on platforms such as Trustpilot and the Apple App Store as part of their business operations. Many of these complaints and reviews expressly state that consumers did not expect to be charged or subscribed immediately upon the provider's review of their intake questionnaire and writing of their prescription, such as:

A. "After filling out the intake form, they indicated there would be a consult with a physician and asked for a credit card information for a subscription - which I understood would be after a consult. I was prescribed and enrolled in a recurring subscription before knowing what the prescription dosage would be." FTC Cmplt. ¶ 33.

B. "I was told that I would be able to speak with a doctor in a few days and that nothing would be charged to my card that day. Him's & Her's [sic] charged me immediately! I never gave consent to apply charges before I spoke with a healthcare professional." *Id.*

C. "I recently filled out a questionnaire for products. I had to entertain [sic] card information, but the app assured me that I would NOT be charged without my approval. 24 hours later, I have a $897 charge on my card that I did NOT approve and was NOT made aware of. I have called numerous times, waiting on hold for 15 minutes each call, and then was hung up on." *Id.*

D. "After completing the questionnaire, I was automatically enrolled in a topical spray treatment I did not want and did not consent to. I was never given the opportunity to consult with a licensed healthcare provider, and within minutes of this automatic enrollment, I attempted to cancel the order and subscription?? [sic] but was unable to do so through the website or customer service." *Id.*

E. "[C]ompleted a mental health assessment… The company asked for my credit card information in the scenario that a prescription was needed. It said that I would not be charged unless the prescription was ordered. [T]here was a question about whether you are willing to take medication… I responded that I was I'm [sic] open to it, but I want more information. To me, this response indicates that you wouldn't automatically agree to ordering and taking the prescription. It was a surprise when I was automatically prescribed Lexapro and charged $147 for a 3-month supply." *Id.*

111. Despite Hims & Hers's awareness that many consumers do not understand they are purchasing a subscription by submitting their Intake Flow, Hims & Hers has continued to make misleading representations to consumers in its advertising, on its websites, and in its Intake Flow.

### E. Hims & Hers Does Not Conspicuously Disclose When It Will Charge Consumers for Refills and Thus Does Not Obtain Consumers' Express Informed Consent to Those Refill Charges

112. Hims & Hers also fails to clearly and conspicuously disclose to consumers the dates of their refill charges. In its Intake Flows, Hims & Hers advises consumers that they will receive refill shipments at regular intervals, which are typically at monthly intervals (i.e., one, three, six, or 12 months).

113. Plaintiffs and Class Members did not consent to the interception or disclosure of their PHI to the Advertising and Analytics Companies, nor could they because Hims & Hers never obtained valid HIPAA authorization to disclose that information.

114. However, Hims & Hers does not charge consumers for these refills at the cadence that consumers select in their Intake Flow. Instead, Hims & Hers has routinely charged for the first refill 10 days before the selected cadence (e.g., on day 20 after the initial charge for a monthly subscription) and required consumers to cancel two days before the refill date (e.g., on day 18 for a monthly subscription) to avoid the charge.

115. Hims & Hers also elects to process some subsequent refills up to two days earlier than the advertised cadence based on holidays or "other operational reasons." FTC Cmplt. ¶ 41.

116. During the Intake Flow—before the consumer provides their billing information and purportedly agrees to sign up for a Hims & Hers prescription subscription—Hims & Hers fails to clearly and conspicuously disclose to consumers this refill processing policy and thus its cancellation deadlines.

117. Rather, in the Intake Flow, Hims & Hers only presents its policy of refill periods in small, low-contrast text underneath the final call-to-action button in the Flow, and does not require that consumers acknowledge or otherwise engage with the policy to proceed. Following their enrollment in Hims & Hers's subscriptions, Hims & Hers typically does not provide consumers

with notifications regarding upcoming refill dates, such that consumers remain unaware of Hims & Hers's refill processing policy before incurring refill charges.

118. Hims & Hers's policy thus increases the likelihood that consumers who wish to cancel their subscription or avoid their next refill charge will miss their deadline and be stuck with another month's worth (or multiple months' worth) of unwanted prescription medication. Numerous consumers have complained to the FTC that they were not made aware of Hims & Hers's refill processing policy and consequently faced unwanted charges.

**F. Hims & Hers Does Not Provide Simple Mechanisms for Consumers to Cancel Subscriptions**

119. From at least 2019 through early 2025, Hims & Hers also imposed a variety of technological hurdles—beyond the inadequately disclosed refill dates—that made it difficult for consumers to cancel their subscriptions in a timely fashion and avoid unwanted charges. FTC Cmplt. ¶ 44.

120. Pre-April 2023, Hims & Hers required most consumers to contact customer service to cancel. FTC Cmplt. ¶ 45.

121. When Hims & Hers required most consumers to contact customer service to cancel, customer service agents could, ostensibly, be contacted by phone, email, or an online chat feature. However, none of these methods provided a simple means of cancellations. *Id.*

122. Post April-2023, Hims & Hers moved to an even more confusing and difficult to use online cancellation flow. FTC Cmplt. ¶ 50.

123. In April 2023, Hims & Hers added the Online Cancellation Flow to its websites (but not its mobile applications) for almost all consumers. Hims & Hers had designed this flow to be anything but a simple cancellation mechanism, making it difficult for consumers to find the option to cancel their subscription and to successfully cancel. *Id.*

124. A consumer seeking to cancel their subscription using the Online Cancellation Flow first had to navigate to their subscription page. Once there, they had to click the button next to their

subscription that said "Add/remove items from order." FTC Cmplt. ¶ 51. Notably, Hims & Hers did not use the word "cancel" anywhere on the subscription page and required consumers to guess that the "Add/remove items from order" button would lead to a cancellation option. *Id.*

125. After clicking the "Add/remove items from order" button, the consumer was then taken to a page that again told the user that they were simply adding or removing items from future refill shipments. FTC Cmplt. ¶ 52. Notably, this page told the consumer that "Any changes will apply to your subscription going forward," suggesting that the consumer was simply modifying their subscription. *Id.* Once again, the word "cancellation" did not appear anywhere on this page, requiring the consumer to again guess that unchecking boxes next to their treatment items might unlock a cancellation feature. *Id.*

126. Assuming the consumer correctly guessed that unchecking all of the items in their subscription would unlock a cancellation option, they would then be shown a subsequent page that, for the first time, revealed the option to cancel the consumer's subscription.

127. Even after clicking the "cancel subscription" button, the consumer's subscription would not be canceled. Instead, the consumer would then have to click through approximately three to ten survey questions—each its own page or screen—and reaffirm that they wished to cancel before Hims & Hers accepted their cancellation request. FTC Cmplt. ¶ 54. These survey questions varied across treatment types and included inquiries such as "Have you experienced side effects?", "Is treatment too expensive for you?", or whether the consumer was interested in a retention offer. *Id.*

128. In June 2022, Hims & Hers implemented a single-click cancel button in Colorado and California. However, when it chose which online cancellation flow to implement in a handful of other states in July 2022 and the remaining states in 2023, Hims & Hers chose to use the prior version of the California flow that it had refined to successfully obstruct cancellations. The Online Cancellation Flow was launched to almost all consumers in April 2023.

129. Consumers using Hims & Hers's mobile applications faced an equally bad or worse experience than website users when attempting to cancel online. Initially Hims & Hers did not permit users to cancel through the mobile app for the Hims & Hers platform. When launched, the mobile app cancellation flow in most states mirrored the Online Cancellation Flow and thus was similarly unclear and confusing and not simple for consumers.

**G. Hims & Hers's Deceptive Privacy Practices**

130. Hims & Hers has engaged in extensive offline advertising, such as on TV, on the radio, or on podcasts.

131. Hims & Hers's offline advertisements have contained similar representations about the privacy of the Hims & Hers Platforms, including describing these platforms as "totally private" or stating that Hims & Hers treats medical conditions "privately." FTC Cmplt. ¶ 65. This claim similarly conveyed that Hims & Hers would not disclose consumers' health information to third parties.

132. Despite promising privacy and discretion, Hims & Hers shared consumers' sensitive health information with third-party advertising companies and platforms, including Meta and Snap. During this time period, Hims & Hers did not disclose to consumers that it would share their PHI with Advertising and Analytics Companies. In fact, it promised the exact opposite.

133. In connection with the promotion and sale of Hims & Hers's services, Hims & Hers has also disseminated, or caused to be disseminated, false or misleading privacy assurances regarding the sensitive PHI that consumers entrust to Hims & Hers. Consumers who enroll and seek treatment on the Hims & Hers Platform have relied on these representations and have been misled as to the sharing of their health information.

134. From the outset, Hims & Hers has made prominent express or implied representations to consumers regarding the privacy of its service—specifically, that Hims & Hers would not disclose consumers' health information to third parties.

135. These representations have been widespread in advertising for the Hims & Hers Platforms, where consumers seek treatment for what are typically very private medical conditions such as mental health, erectile dysfunction, and premature ejaculation.

136. For example, until at least late August 2023, a question on the Hims & Hers website homepage asked, "How does Hims ensure patient privacy?" FTC Cmplt. ¶ 62. In its response, Hims & Hers assured consumers that their "medical records and sensitive information are only accessed by the medical providers managing your care." *Id.* This claim conveyed to consumers that, outside of the consumer's medical provider, Hims & Hers would not disclose their health information to third parties.

137. In Hims & Hers's online advertisements, Hims & Hers prominently advertised that it affords consumers a "100% online, private, and secure process." FTC Cmplt. ¶ 63. This claim also conveyed to consumers that Hims & Hers would not disclose their health information to third parties.

138. Hims & Hers also publishes numerous advertisements by way of "influencers" – social media personalities. Since at least 2019, Hims & Hers has solicited and paid influencers to promote Hims & Hers's products and services. Hims & Hers reviewed, edited, and ultimately had final approval over the advertisements published by influencers on their social media pages. Some influencers expressly describe Hims & Hers's services as "discreet." FTC Cmplt. ¶ 64. This claim further reinforced Hims & Hers's promises to consumers that it would not disclose their health information to third parties.

**H. Hims & Hers Promises to Users**

139. Of course, consumers expect their communications with Hims & Hers to remain confidential. This is because this information, including health data like whether a person is experiencing erectile dysfunction or needs certain medication, is highly sensitive and private.

140. Given this expectation of privacy in this type of sensitive information, it is unsurprising that Hims & Hers assured users this information would remain confidential.

**FIGURE 6**[16]

## Commitment to patient privacy and data security

At Hims & Hers, protecting our customers' privacy is our top priority.

Here's how:

- **Hims & Hers protects customer data.** We protect customer data with robust security practices that meet or exceed industry standards. All personal information is encrypted, stored securely, and handled with the highest levels of care and confidentiality.
- **Hims & Hers is designed with privacy in mind.** We are committed to respecting our customers' data by implementing a privacy-by-design approach and abiding by data minimization principles.
- **The customer is in charge.** Customers can visit privacy.hims.com at any time to view, correct, delete, limit the use of their sensitive personal data, or opt out of the sale of personal data.

Hims & Hers adheres to all applicable privacy laws and will always be transparent about collecting and using customer data.

For more details, view our Privacy Policy.

141. As noted above in **Figure 6**, Hims & Hers boasts that it "protects" customer data and, in fact, meets or exceeds industry standards, has designed its platform with privacy in mind, and adheres to privacy laws.

142. Hims & Hers's privacy policy reinforces this notion, stating that "any medical or health information that you provide that is subject to specific protections under applicable state laws (collectively, with PHI, "Protected Information"), will be used and disclosed only in accordance with such applicable laws."[17] The policy further states "we do not use Protected Information for advertising or marketing."[18]

[16] *About the company: Hims & Her*s, HIMS & HERS, https://www.hims.com/about/the-company (last visited July 30, 2026).

[17] *Privacy Policy*, HIMS & HERS HEALTH, INC., https://www.hims.com/privacy-policy (last updated March 26, 2026).

[18] *Id.*

143. Hims & Hers Medical Group's Notice of Privacy Practices makes similar promises, stating "Other than expressly provided herein, any other uses or disclosures of your medical information will require your specific written authorization."[19]

144. The FTC Complaint details additional privacy promises and representations made by Hims & Hers.

145. The FTC Complaint states that, until at least August 2023, the Hims website represented, in response to "How does Hims ensure patient privacy?" that "medical records and sensitive information are only accessed by the medical providers managing your care." FTC Cmplt. ¶ 62.

146. The FTC Complaint also alleges that in online advertisements, Hims & Hers stated that it provides a "100% online, private, and secure process." FTC Cmplt. ¶ 63. The Complaint further states that Hims & Hers made similar representations in offline advertisements. FTC Cmplt. ¶ 65.

147. Given these representations and the types of services Hims & Hers provides, users like Plaintiffs and Class Members expected their data, including health information, and other interactions on the Hims & Hers Platform, to remain confidential.

148. Unfortunately, Hims & Hers's assurances were false. Despite these promises, Hims & Hers disclosed and allowed third parties to intercept highly sensitive personal and medical information that Plaintiffs and Class Members entered on the Hims & Hers Platform.

149. In addition, Hims & Hers disclosed, and allowed third parties to intercept, unique and persistent identifiers linked to individual Hims & Hers users in the same transmission of their health information. These identifiers are a set of unique data points (typically numbers and letters), akin to a Social Security number, that can individually identify one specific individual across all the apps and websites they use, allowing them to be tracked over time and across devices (e.g., smartphones, tablets, laptops, desktops, etc.).

[19] *Hims & Hers Medical Groups Notice of Privacy Practices*, https://www.hims.com/notice-of-privacy-practices (last visited July 30, 2026).

150. Hims & Hers knew that it disclosed and allowed third parties to intercept its users' sensitive personal information, including health data. Indeed, according to the FTC Complaint, Hims & Hers created "Events" that were sent to, at least, Meta that were configured in a way that disclosed health information. FTC Cmplt. ¶¶ 67, 70. Only Hims & Hers could configure those events.

**I. Background on Tracking Technology**

151. Pixels are one of the most common forms of Tracking Technology used by website operators to track users' behavior, interactions, and the content of their communications online.

152. Pixels are typically snippets of code embedded on a website that are designed to surreptitiously intercept a user's actions, including private communications on that app or property.

153. Pixels can collect a shocking amount of private information regarding an individual's online communications, including their searches, queries, what content they select and view, what they enter into online forms, and their habits and behaviors.

154. Web developers, like Hims & Hers, can use pixels to send additional information specific to their website. As described herein, Hims & Hers configured the pixels at issue in this case to transmit and intercept consumers'/patients' health data alongside personally identifiable information.

155. As the FTC explains in its report *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, one of the purposes of using pixels is to monetize consumers' data:

> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns. The data can be used to target more specific audiences with ads and other marketing messages. Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[20]

[20] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION, (Mar. 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking.

Particularly problematic, consumers have no way of knowing these pixels are present because they are invisible. The FTC further warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…[21]

156. Software development kits function in the same manner except they operate within mobile applications as opposed to websites.

157. As described below, Hims & Hers used Tracking Technology provided by at least Google, Meta, and Snap.

158. Plaintiffs and Class Members had no way of knowing Hims & Hers used this Tracking Technology or that their private data would be used and intercepted as a result.

159. Especially problematic, Meta, Google, and Snap are some of the largest advertising platforms in the world. Each of these entities uses the intercepted information for its own commercial purposes, including to augment the profiles they maintain about individuals and improve their technology for targeting individuals with ads both on properties they own and operate (e.g., Facebook, Instagram, Google.com, or the Snapchat apps) and other web properties that participate in their respective ad networks.

160. This includes any information Hims & Hers uploaded in addition to data collected by Tracking Technology to further target or improve its ads. In addition to using data captured through their Tracking Technologies, at least Meta and Google allow website and app operators to upload data manually (e.g., with an Excel spreadsheet or text file) or through an API about actual customers. This has two main functions: (1) to better track ad conversions (e.g., by uploading data about a patient who purchased a treatment plan from Hims & Hers so that it can be attributed to an ad), and (2) to create custom lists of individuals (a/k/a audiences) to target with ads (e.g., by uploading a list of all patients who completed the erectile dysfunction questionnaire but did not

[21] *Id.*

check out, Hims & Hers can directly target them with ads encouraging them to complete the process). The Tracking Technology company receiving this data also benefits as it matches any uploaded information to actual users (e.g., person's Facebook or Instagram profile) for ad targeting and profiling, as well as other commercial purposes.

161. Although any such uploads are not publicly visible because they occur either within Hims & Hers's account with Tracking Technology providers or by direct transmission from their servers, it is such a common practice in digital marketing to use both Tracking Technology and customer list uploads to target digital ads that Plaintiffs expect discovery will uncover evidence of Hims & Hers uploading patient data to Meta, Google, or other Tracking Technology providers for the same purpose.

**J. Meta's Tracking Technology on the Hims & Hers Platform**

162. Meta operates the world's largest social media company and generated $164 billion in revenue in 2024, almost all of which came from advertising. Meta's advertising business has been extremely successful due, in large part, to Meta's ability to target people at a granular level.

163. In conjunction with its advertising business, Meta encourages and promotes entities and web property owners, such as Hims & Hers, to utilize its "Business Tools" to gather information about people and to identify, target, and market products and services to them.

164. One such Business Tool is the Meta Pixel. Upon its release in 2015, Meta touted Meta Pixel as a new way to gain insights about how people use your website. The "pixel" itself is a small snippet of website code written by Meta engineers. To use the Meta Pixel, an advertiser places a pixel (i.e., a code snippet) on their website.

165. The Meta Pixel is designed to "track[] the people and type of actions they take" across all pages accessible on a web property with a single code snippet.[22] When a user accesses a webpage on a web property using the Pixel, their communications with *every* webpage are

[22] *Retargeting*, Meta, https://www.facebook.com/business/goals/retargeting (last visited January 14, 2026).

instantaneously and surreptitiously intercepted and recorded by Meta's code and sent to Meta's servers.

166. Through this technology, Meta intercepts information about each page a user visits, what buttons they click, as well as specific words they type into questionnaire boxes (e.g., when applying for admission, signing up for a class, or searching) on the web property. Meta also receives "events" data reflecting data fields identified by the web property owner, which can reveal even more information about the individual and their specific interactions or communications.

167. The information Meta receives via the Meta Pixel includes identifying information that is sufficient to identify a particular individual either directly (e.g., by name or email) or in combination with other information, like unique device identifiers, cookie values, and IP addresses, already in Meta's possession (e.g., either because it was collected from another web property using its Tracking Technology or the individuals' use of a Meta owned and operated app or property).

168. For instance, Meta uses "[a]dvanced matching" techniques to link the data received via the Meta Pixel to Facebook users[23] and also analyzes information entered in online forms to uncover further PHI about the user, such as their email address, to further identify each respective individual.[24]

169. Meta stores the data captured by its Tracking Tools on its own servers for its own commercial purposes. Meta then provides the web property owner whose property this information is recorded from with access to analytics generated from the raw event-level data it recorded (e.g., which users took certain actions on any given webpage, how many, etc.). This is accessed through the web property owner's Facebook Ads Manager account, as well as potentially through the Facebook Events Manager.[25] The data available to the web property owner is a limited set and

[23] *Advanced Matching*, META https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching/ (last visited January 26, 2026).
[24] *About advanced matching for web*, META https://www.facebook.com/business/help/611774685654668?id =1205376682832142 (last visited January 26, 2026).
[25] *Conversion Tracking*, META https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited January 26, 2026).

*does not* include all information Meta has about the individuals whose communications and actions it recorded through its Tracking Technology.

170. In this way, the Meta Pixel has two purposes: (1) it enriches Meta's ability to collect data about individuals across the web, and enriches its profiles about them, and (2) it facilitates web property owners spending money on Meta ads. For instance, Meta encourages website owners to create "custom audiences" of users who have taken the same or similar actions on the website based on the data received through the Meta Pixel to target them directly with ads. Meta also uses this audience to "identify other Facebook users" similar to them (i.e., "lookalikes") and to "target [those similar users] with [the website owner's] ads."[26] Meta uses the full complement of data in its possession—not just that received from the web property—to identify these individual targets.

171. Meta also uses the data it receives through the Meta Pixel to fuel its own advertising business. Meta's documentation confirms that Meta feeds the data received through the Meta Pixel into "machine learning models" that "consider that person's behavior" to predict who is likely to respond to any given ad, making its advertising services even more lucrative.[27] These machine learning models "learn[]" more about individuals as they "receive[] new data."[28] Thus, each person whose data Meta receives through the Meta Pixel directly contributes to how successful Meta is at targeted advertising and contributes to Meta's ad revenue. And individual consumers who have their data disclosed by one entity (for instance, Hims & Hers) will see ads for other entities based on their data as a result of Meta's advertising system.

172. In true "move fast and break things" spirit, Meta built these systems to sell ads without incorporating any way to limit the use of data collected through Meta Pixel, or prevent Meta Pixel from acquiring sensitive data. According to leaked internal Meta documents, Meta does "not have an adequate level of control and explainability over how our systems use data, and thus

---

[26] *Id.*
[27] *Good Questions, Real Answers: How Does Facebook Use Machine Learning to Deliver*, Meta (June 11, 2020), https://www.facebook.com/business/news/good-questions-real-answers-how-does-facebook-use-machine-learning-to-deliver-ads.
[28] *Id.*

we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'" Thus, any data the Meta Pixel intercepted from the Hims & Hers Platform was incorporated into Meta's ads systems and models to benefit its business.

173. Meta's customers, like Hims & Hers, can also send data to Meta through a server-to-server connection (e.g., the API referenced above) or through a third-party intermediary (e.g., sending data to a data platform like AppsFlyer or mParticle which then routes traffic to Meta and others). This allows customers like Hims & Hers to disguise what data it sends to Meta because no one (other than these parties) can observe what data Hims & Hers uploads directly to Meta for use in ads, or sends through third parties. Which data Hims & Hers uploaded to Meta directly or sent through third parties and how that data is used, accordingly, will be uncovered during discovery.

174. Hims & Hers uses Meta's Tracking Technology on the Hims & Hers Platform. As a result, Hims & Hers disclosed, and Meta intercepted, Plaintiffs' and Class Members' interactions on the Hims & Hers Platform. Meta received at least first party and third party cookies, other identifiers, and custom events.

175. According to the FTC Complaint, the events shared with Meta conveyed "consumers' health information." FTC Cmplt. ¶ 67. This information was shared directly through the Meta Pixel, as well as Meta's Conversions API, i.e., the process of sending data through a server-side connection. FTC Cmplt. ¶ 70. Hims & Hers used this data to create audiences used to target Plaintiffs and Class Members. FTC Cmplt. ¶ 74.

176. Plaintiffs did not consent to the interception or disclosure of their health information to Meta, nor could they because Hims & Hers never obtained valid HIPAA authorization to disclose that information. Hims & Hers's disclosure, and Meta's interception, of Plaintiffs' PHI, health data, and other information without their consent is an invasion of privacy and violates several laws, including the ECPA, CMIA, and CIPA.

**K. Google's Tracking Technology on the Hims & Hers Platform**

177. Google is one of the largest digital advertiser platforms in the world, with a market capitalization of over $3 trillion. Google accounts for 26.8% of the total digital advertising revenue generated in the United States.[29] In 2023, Google's advertising revenue of $238 billion accounted for 77% of its total revenue for the year.[30]

178. Google "make[s] money" from its "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[31]

179. Google offers various Tracking Technologies, including Google Analytics and Google Ads, which exist solely to help drive ad revenue. For instance, Google's analytics products integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products, increasing Google's overall ad revenue. Products like Google Analytics, Google Chrome, and Google's Android operating system also improve the company's advertising network and capabilities by providing a direct pipeline to Google of data that it uses to enrich the vast amount of interconnected data it maintains about them.

[29] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-adselling-companies-in-the-us-byrevenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively; https://www.scientificamerican.com/article/7-in-10-smartphone-appsshare-your-data-with-third-party-services/ (last visited Oct. 23, 2025).

[30] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companiesoffering-searchsolutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last visited Oct. 23, 2025).

[31] ALPHABET INC. SEC FORM 10-K FOR FISCAL YEAR ENDED DECEMBER 31, 2020, https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

180. Google advertises Google Analytics and other business tools to website operators to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[32]

181. Google Analytics is deployed by dropping a piece of Google-engineered code on a given web property or app. This code immediately intercepts a user's interaction with the web property or app every time the user visits or uses it, including what pages they visit, what they click on, and what they input into text fields.

182. The code also collects multiple pieces of identifiable information so that Google can connect that data within its systems to a specific individual. This includes multiple cookie values Google creates for this precise purpose, along with device information, such as unique ad identifiers and settings used to create a digital "fingerprint" for people, IP addresses that tie them to specific locations (like their home), and more. This does not require a person to have a Google account, to be signed into their Google account, or to use a Google product. Google has a special set of cookies and systems created specifically to track and identify individuals not signed into a Google product at the time they use a website, or who attempt to use private browsing mode.[33]

183. Google provides web property owners with analytics about their sites and apps based on this data, including reports on acquisition (e.g., information about where the customer's traffic originates, the methods by which users arrive at the customer's site or app, and the marketing efforts the customer uses to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visit), and demographics (e.g., classify the customer's users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities). However, the main purpose of Google's tracking technologies, including Google Analytics, is to promote targeted ads both on Google.com (so called "search ads" or "Google ads") or other Google owned

---

[32] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last visited Oct. 23, 2025).

[33] *Brown v. Google LLC*, 685 F. Supp. 3d 909, 925 n.11 (N.D. Cal. 2023).

and operated products (e.g., YouTube), and across Google's display network (Google "display ads") which include thousands if not millions of web properties.

184. In addition to providing customers with analytics and ads services, Google also uses the data collected through Google Analytics and other tracking technologies for its own purposes, including to improve its ad targeting capabilities, machine learning and AI models, products and services, and data collections on users. Thus, the data Hims & Hers disclosed, and allowed Google to intercept, is actively used by Google to improve and serve advertisements. And individual consumers who have their data disclosed by one entity (for instance, Hims & Hers) will see ads for other entities based on their data as a result of Google's advertising system.

185. Further, as with Meta, customers like Hims & Hers can also send data to Google either by uploading it directly, through a server-to-server connection or through a third-party intermediary. This allows customers like Hims & Hers to disguise what data they sends to Google because no one (other than these parties) can observe what data is sent server-side.

186. Hims & Hers uses Google's Tracking Technology on the Hims & Hers Platform. As a result, Hims & Hers disclosed, and Google intercepted, Plaintiffs' and Class Members' interactions on the Hims & Hers Platform. Google received at least first party cookies, other identifiers, browser information, full-string URLs that would disclose the types of questionnaires completed by Plaintiffs and Class Members, and thus health information, and event names revealing additional information, for example, that a consultation was started or the consumer/patient was signed in.

187. Plaintiffs did not consent to the interception or disclosure of their data to Google, nor could they because Hims & Hers never obtained valid HIPAA authorization to disclose that information. Hims & Hers's disclosure, and Google's interception, of Plaintiffs' PHI, health data, and other information without their consent is an invasion of privacy and violates several laws, including the ECPA, CMIA, and CIPA.

### L. Snap's Tracking Technology on the Hims & Hers Platform

188. Snap is a publicly traded company with over 900 million daily active users across the globe. As Snap admits in its filings with the SEC, "substantially all of [its] revenue" is generated from advertising, with 91% of its revenue in 2024 coming from ads.

189. As Snap also admits, its advertising business "rel[ies] heavily" on its "ability to collect, process, and disclose data" including "personal data," to advertisers and others.[34]

190. Like the other advertising giants above, Snap offers tracking tools, including the Snap Pixel, to collect information that feeds its advertising business.

191. The Snap Pixel (like other pixels) is a snippet of code placed on an advertiser's web property that tracks user actions as they interact with a website, including their actions and queries, such as viewing a particular webpage, making a purchase, and adding a specific item to their cart.

192. Snap "strongly" encourages its customers (i.e., web property owners) to send individual email addresses or phone numbers through the Snap Pixel so they can better target these individuals with ads, e.g., by joining the data intercepted with their Snap profile or other data in Snap's possession. In addition to these forms of PHI, the Snap pixel also intercepts IP address, first and third party cookies, and other browser information that helps to fingerprint users.[35] Snap uses this "variety of signals" to engage in "PII matching" and identify individuals.[36]

193. Snap uses this identifiable data not only to serve ads on behalf of its customers, but for its own reasons. This includes training machine learning models, improving targeting capabilities, creating custom and "look-alike" audiences and models, and for reporting purposes.[37]

194. In addition to the Snap Pixel, Snap also has a Conversions API, which allows customers, like Hims & Hers, to send data directly to Snap through a server-to-server integration.

---

[34] SNAP INC. SEC FORM 10-K FOR FISCAL YEAR ENDED DECEMBER 31, 2024, https://www.sec.gov/Archives/edgar/data/1564408/000156440825000019/snap-20241231.htm?

[35] *Pixel Implementation FAQs*, SNAP, INC., https://businesshelp.snapchat.com/s/article/snap-pixelfaq?language=en_US (last visited January 26, 2026).

[36] *Id.*

[37] *Id.*

Snap encourages customers to use these technologies together, which avoid detection because no one other than Snap and its customer can observe what data is sent through this connection.[38] As with other upload only and third party data flows described above, which data Hims & Hers uploaded directly to Snap is exclusively in its possession and will be identified in discovery.

195. Hims & Hers uses Snap's Tracking Technology on the Hims & Hers Platform. As a result, Hims & Hers disclosed, and Snap intercepted, Plaintiffs' and Class Members' interactions on the Hims & Hers Platform. Snap received at least cookies, its own identifier and other identifiers, and events.

196. According to the FTC Complaint, the data shared with Snap conveyed "consumers' health information." FTC Cmplt. ¶ 76. This information was shared directly through Snap's Tracking Technology and by uploading list of additional data so that Snap can "match these users to their Snapchat accounts." *Id.* Plaintiffs' own investigation revealed that, in addition to event data, Snap received SHA256 hashed email addresses, which Snap uses to match users to their Snapchat accounts.

197. Plaintiffs did not consent to the interception or disclosure of their PHI to Snap, nor could they because Hims & Hers never obtained valid HIPAA authorization to disclose that information. Hims & Hers's disclosure, and Snap's interception, of Plaintiffs' PHI, health data, and other information without their consent is an invasion of privacy and violates several laws, including the ECPA, CMIA, and CIPA.

**M. Other Tracking Technologies on the Hims & Hers Platform**

198. Hims & Hers incorporated a host of other third parties' Tracking Technologies on the Hims & Hers Platform. According to the FTC Complaint, Hims & Hers also incorporated Tracking Technologies from: Microsoft (Bing Pixel and Bing Image Pixel); Criteo (Criteo Pixel); MediaBids.com (MediaBids Pixel); PartnerCentric (PartnerCentric Pixel); PebblePost.com (PebblePost Pixel); Pinterest (Pinterest Pixel); Podsights (now known as Spotify Ad Analytics -

[38] *Snap Pixel: Power Your Ad Performance*, SNAP, INC., https://forbusiness.snapchat.com/advertising/snap-pixel? (last visited January 26, 2026).

Podsights_iHeartMedia Pixel); Reddit (Reddit Pixel); StackAdapt (StackAdapt Pixel); TikTok (TikTok s2s Pixel); the Trade Desk (Trade Desk Pixel); and X (formerly known as Twitter - Twitter Pixel). FTC Cmplt. ¶ 77.

199. In addition to the tracking technologies identified by the FTC, Plaintiffs' own investigation detected Tracking Technologies offered by Amplitude, Datadog, Stripe, Branch, and Braze on Hims & Hers's websites or mobile application.

200. At least one of these companies, Amplitude, also received PHI through Hims & Hers's incorporation of Tracking Technologies on the Hims & Hers Platform.

201. For instance, on the mobile application, Amplitude received AAID, user ID, device information, a device identifier, and event names that reveal the type of treatment sought (i.e., mental health, weight loss, etc.).

202. On the website, Amplitude received user and device identifiers, the Meta "fbp" cookie, and data revealing the type of questionnaire and treatment sought (for instance, "consultation/hair-loss"), as well as actual questionnaire answers.

**FIGURE 7**



"page": "hair_goals",
"page_session_id": "d8185c96-ebe3-4542-8816-d17f560d7ef6",
"raw_page": "hair_goals",
"selected_choices": [
"Experiencing hair loss, ready to start treatment ASAP"
],
"selected_choices_one_line": "Experiencing hair loss, ready to start treatment ASAP",
"server_unique_id": "9bbf6527-3df3-465e-9810-67c53533bbdc",
"visit_type": "HAIR_LOSS",
"zeus": "true"
},
"event_type": "visit:selected_visit_use_case",
"group_properties": {


203. Every time Hims & Hers disclosed users' PHI to a third party through the Tracking Technology incorporated in the Hims & Hers Platform, and those third parties intercepted users'

data, it constituted a separate invasion of Plaintiffs' and Class Members' privacy and violation of the law.

**N. The Data Disclosed to Advertising and Analytics Companies Uniquely Identified Each Specific Class Member, Including Plaintiffs**

204. Meta, Snap, and Google provide customers like Hims & Hers with one or more unique identifiers precisely so each individual whose data is sent through the Tracking Technology can be identified and targeted. For example, customers like Hims & Hers can send data to Meta alongside Meta-specific cookies, including the "fbc" cookie, which is a first party cookie containing a Facebook click identifier, and the c_user, fr, and datr cookies, all of which are an individual's Facebook User ID or linked to that unique identifier.[39]

205. Similar to the above, Google has its own collection of cookies, including the "ide" DoubleClick cookie, the "ga"/"cid" cookie, and "sid" cookie. Meanwhile, Snap uses its own "u_sclid" identifier. These cookies all serve the same purpose—to uniquely track and identify consumers.

206. In this way, these unique identifiers serve a similar function to social security numbers used by the United States Government—they are associated with only one person, much like the Government knows which specific person is associated with each social security number. Through these identifiers, Meta, Snap, and Google know which specific person is associated with each of their unique identifiers.

207. Google, Meta, and Snap are especially able to identify individuals who have accounts with them. A remarkable number of Americans possess a Google, Meta, or Snap account. One-third of Americans have accounts with Google's Gmail email client; over 80% of Americans use YouTube, Google's video client; over 70% report using Facebook, and a quarter use Snapchat.[40]

---

[39] Meta also uses the "fbp" cookie, which can act as a fallback to identify individual users when other cookies are unavailable.

[40] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last visited Oct. 23, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. See UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last

When these users visit a website, like the Hims & Hers Platform, that utilizes these companies' Tracking Technologies, any information collected by the Pixels can be linked to the user's respective accounts with these entities through identifiers and other means. Because these accounts contain directly identifiable information (e.g., a user's name, email address, phone number, and/or address), any PHI Hims & Hers disclosed is also identifiable to each of these third parties.

**O. Plaintiffs and Class Members Did Not Consent to Hims & Hers's Conduct**

208. Plaintiffs and Class Members had no way of knowing that Hims & Hers was disclosing, and the Advertising and Analytics Companies were intercepting, their communications when interacting with the Hims & Hers Platform, because their software is inconspicuously incorporated in the background.

209. Plaintiffs and Class Members did not consent to the interception or disclosure of their PHI to the Advertising and Analytics Companies, nor could they because Hims & Hers never obtained valid HIPAA authorization to disclose that information.

210. This conduct is all the more egregious given the nature of the information entered into the Hims & Hers Platform, e.g., PHI, requests for prescriptions, and identifiable medical information, among other things.

211. Hims & Hers's Tracking Technologies are embedded platform-wide and load automatically when a consumer accesses the Hims & Hers Platform. As a result, Hims & Hers's Tracking Technologies begin intercepting and transmitting a consumer's information, including the consumer's responses to Part One of the Intake Flow, from the moment the consumer begins using the Hims & Hers Platform — before the consumer reaches Part Two of the Intake Flow and creates an account with personal login information.

212. Accordingly, Hims & Hers disclosed, and the Advertising and Analytics Companies intercepted, Plaintiffs' and Class Members' information beginning with their initial responses on

---

accessed Oct. 23, 2025); Jeffrey Gottfried and Eugene Park, *Americans' Social Media Use 2025*, PEW RESEARCH (Nov. 20, 2025), https://www.pewresearch.org/internet/2025/11/20/americans-social-media-use-2025/ (last visited Mar. 4, 2026).

the Hims & Hers Platform — before Plaintiffs and Class Members had created an account or taken any other affirmative step with Hims & Hers beyond answering initial questions about their treatment interests and goals.

213. Plaintiffs and Class Members would not expect that this information would be disclosed or intercepted without their consent.

214. This is especially true given Hims & Hers's consistent representations that this information would remain private and confidential.

**P. Plaintiffs and Class Members Have a Reasonable Expectation of Privacy in Their User Data**

215. Plaintiffs and Class Members have a reasonable expectation of privacy in their communications on the Hims & Hers Platform, including their health information.

216. Privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' personal data.

217. For example, a recent study by *Consumer Reports* shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them. Moreover, according to a study by *Pew Research Center*, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.

218. Users act consistently with these preferences. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data when prompted.

219. Another recent study by DataGrail revealed that 67% of people were willing to pay $100 or more annually to keep their information out of the hands of companies and the government.

The same study revealed that 75% of people would abandon brands that do not take care of their data.[41]

220. Other privacy law experts have expressed concerns about the disclosure to third parties of users' intimate health data. For example, Dena Mendelsohn—the former Senior Policy Counsel at Consumer Reports and current Director of Health Policy and Data Governance at Elektra Labs—explained that having your personal health information disseminated in ways you are unaware of could have serious repercussions, including affecting your ability to obtain life insurance and how much you pay for that coverage, increasing the rate you're charged on loans, and leaving you vulnerable to workplace discrimination.

221. Hims & Hers's surreptitious disclosure and interception of Plaintiffs' and Class Members' private communications, including PHI, health information, and other sensitive data, violates Plaintiffs' and Class Members' privacy interests.

222. The data Hims & Hers disclosed and the Advertising and Analytics Companies intercepted is also extremely valuable. According to Experian, health data is a "gold mine" for healthcare companies and clinicians.

223. Consumers' health data, including what prescriptions they have, is extremely profitable. For instance, Datarade.ai advertises access to the names, addresses, email addresses, and telephone numbers of U.S. customers who bought brand-name medicine. The starting price for access to just some of this data was $10,000. Other companies, like Pfizer, spend $12 million annually to purchase health data, and the medical data industry itself was valued at over $2.6 billion back in 2014. Without question it is worth exponentially more now.

[41] DATAGRAIL, *New DataGrail Research, The Great Privacy Awakening, Underscores How Far People are Willing to Go to Protect Their Personal Information in Absence of Federal Regulations*, https://www.datagrail.io/press/new-datagrail-research-the-great-privacy-awakening/ (last visited Mar. 13, 2026).

224. Hims & Hers monetized and used the data collected from Hims & Hers users to serve personalized advertisements, including through audiences on the Meta platform. This further compounds Hims & Hers's privacy violations.[42]

## TOLLING, CONCEALMENT, AND ESTOPPEL

225. The applicable statutes of limitation have been tolled as a result of Hims & Hers's knowing and active concealment and denial of the facts alleged herein.

226. Hims & Hers secretly incorporated the Advertising and Analytics Companies' software into the Hims & Hers Platform, providing no indication to users that they were interacting with sites that shared their data, including their PHI, with third parties.

227. Hims & Hers had exclusive knowledge that the Hims & Hers Platform incorporated the Advertising and Analytics Companies' software, yet failed to disclose that fact to users, or that by interacting with the Hims & Hers Platform Plaintiffs' and Class Members' sensitive data, including PHI, would be disclosed to and intercepted by third parties.

228. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Hims & Hers's conduct, including because it is highly technical and there were no disclosures or other indication that would inform a reasonable consumer that Hims & Hers was disclosing, and third parties were intercepting, data from the Hims & Hers Platform.

229. The earliest Plaintiffs and Class Members could have known about Hims & Hers's conduct was shortly before the filing of this Complaint.

230. Hims & Hers was under a duty to disclose the nature and significance of its data collection practices but did not do so. Hims & Hers is therefore estopped from relying on any statute of limitations under the discovery rule.

231. Additionally, Hims & Hers engaged in fraudulent conduct to prevent Plaintiffs and Class Members from discovering the disclosure and interception of their data. Hims & Hers misled

[42] *Healthcare data: the value of historical patient data*, EXPERIAN HEALTH (JUN. 16, 2022), https://www.experian.com/blogs/healthcare/healthcare-data-the-value-of-historical-patient-data/ (last visited July 30, 2026).

Plaintiffs and Class Members to believe their data, including health data and PHI, would not be disclosed or intercepted.

232. Plaintiffs and Class Members were not aware that Hims & Hers disclosed and allowed for the interception of their data, including PHI.

233. Plaintiffs and Class Members did not have actual or constructive knowledge of Hims & Hers's misconduct by virtue of their fraudulent concealment.

234. Accordingly, all statutes of limitations are tolled under the doctrine of fraudulent concealment.

## CLASS ACTION ALLEGATIONS

235. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Classes:

> **Nationwide Privacy Class:** All natural persons in the United States who used the Hims & Hers Platform and whose communications and/or PHI were shared with third parties, including the Advertising and Analytics Companies.
>
> **Nationwide Subscription Class:** All natural persons in the United States who paid for a Hims or Hers subscription and were misled by Hims & Hers's deceptive marketing and cancellation practices.
>
> In addition, or in the alternative, Plaintiffs plead the following Subclasses:
>
> **California Privacy Subclass:** All natural persons in the State of California who used the Hims & Hers Platform and whose communications and/or PHI were shared with third parties, including the Advertising and Analytics Companies.
>
> **California Subscription Subclass:** All natural persons in the State of California who paid for a Hims or Hers subscription and were misled by Hims & Hers's deceptive marketing and cancellation practices.

236. Excluded from the Classes and Subclasses are: (1) any Judge or Magistrate Judge presiding over this action and any members of their immediate families; (2) Hims & Hers, its subsidiaries, affiliates, parents, successors, predecessors, and any entity in which Hims & Hers or

its parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Hims & Hers's counsel.

237. **Numerosity:** The exact number of members of the Classes and Subclasses is unknown and unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable. The Classes and Subclasses likely consist of millions of individuals, and the members can be identified through Hims & Hers's records.

238. **Predominant Common Questions:** Common questions of law and fact for the Classes and Subclasses predominate and include, but are not limited to, the following:

A. Whether Hims & Hers violated Plaintiffs' and Class Members' privacy rights;

B. Whether Hims & Hers's acts and practices violated the California Constitution right to privacy;

C. Whether Hims & Hers's acts and practices violated common law right to privacy;

D. Whether Hims & Hers was negligent;

E. Whether Hims & Hers was unjustly enriched;

F. Whether Hims & Hers's acts and practices violated Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, *et seq.*;

G. Whether Hims & Hers's acts and practices violated California's Confidentiality of Medical Information Act ("CMIA"), Cal. Civil Code §§ 56, *et seq.*;

H. Whether Hims & Hers's acts and practices violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630, *et seq.*;

I. Whether Hims & Hers's acts and practices violated Section 5 of the FTC Act, 15 U.S.C. § 45;

J. Whether Hims & Hers's acts and practices violated California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*;

K. Whether Hims & Hers's acts and practices violated California's False Advertising Law ("FAL"), Cal. Business and Professions Code § 17500, *et seq.*;

L. Whether Hims & Hers's acts and practices violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.;*

M. Whether Hims & Hers's acts and practices violated California's Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502;

N. Whether Hims & Hers's acts and practices violated the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403;

O. Whether Hims & Hers's acts and practices violated California's Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code § 17600, *et seq.*;

P. Whether Plaintiffs and the Class Members are entitled to equitable and injunctive relief, including, but not limited to, injunctive relief, restitution, and disgorgement; and

Q. Whether Plaintiffs and the Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

239. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Classes and Subclasses. The claims of Plaintiffs and the members of the Classes and Subclasses arise from the same conduct by Hims & Hers and are based on the same legal theories.

240. **Adequate Representation:** Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes and Subclasses. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiffs have no interest that is antagonistic to the interests of the Classes and Subclasses, and Hims & Hers has no defenses unique to any Plaintiff. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes and Subclasses, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the interests of the other members of the Classes and Subclasses.

241. **Substantial Benefits:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this

controversy and joinder of all members of the Classes and Subclasses is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

242. Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

**CALIFORNIA LAW APPLIES TO THE CLASSES AND SUBCLASSES**

243. California substantive laws apply to every member of the Classes and Subclasses. California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Classes under the Due Process Clause, 14th Amend. § 1, and the Full Faith and Credit Clause, Art. IV. § 1 of the U.S. Constitution. California has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and Class Members, thereby creating state interests to ensure that the choice of California state law is not arbitrary or unfair.

244. Hims & Hers maintains its principal place of business in California and conducts substantial business in California, such that California has an interest in regulating Hims & Hers's conduct under its laws.

245. The application of California laws to the Classes and Subclasses is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the proposed Classes and Subclasses, and California has a greater interest in applying its laws here given Hims & Hers's location and the location of the conduct at issue than any other interested state.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**Violation Of the Electronic Communications Privacy Act**
**18 U.S.C. Sections 2510, *et seq*.**
**(On Behalf of All Plaintiffs and the Nationwide Privacy Class)**

246. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

247. The ECPA prohibits the intentional interception of or procuring another person to intercept the contents of any electronic communication and the use of information obtained through the interception of any electronic communication. 18 U.S.C. § 2511.

248. The ECPA protects both the sending and receipt of communications.

249. The ECPA provides a private right of action to any person whose electronic communications are intercepted. 18 U.S.C. § 2520(a).

250. At all relevant times, Hims & Hers aided, employed, agreed with, conspired with, and procured third parties, including at least Meta, Google, and Snap, to track and intercept Plaintiffs' and Nationwide Privacy Class Members' internet communications while accessing the Hims & Hers Platform, and to use these intercepted communications. These communications were transmitted to and intercepted by third parties during the communication and without the knowledge, authorization, or consent of Plaintiffs and Nationwide Privacy Class Members.

251. The transmissions of data between Plaintiffs and Nationwide Privacy Class Members and Hims & Hers qualify as communications under the ECPA. 18 U.S.C. § 2510(12).

252. Hims & Hers intentionally inserted an electronic listening device onto Plaintiffs' and Nationwide Privacy Class Members' web browsers and devices that, without their knowledge and consent, tracked and transmitted the substance of their confidential communications with Hims & Hers to, at least, the Tracking Technologies described herein.

253. Hims & Hers willingly facilitated third parties' interception, recording, and collection of Plaintiffs' and Nationwide Privacy Class Members' private communications by embedding the Tracking Technologies on the Hims & Hers Platform and used the intercepted

communications for its own analytics and advertising. Hims & Hers played an active role in the use of the third-party Tracking Technologies by customizing and deploying the third-party Tracking Technologies on the Hims & Hers Platform. Hims & Hers has full control over the Tracking Technologies, including which pages contain them, what information is tracked and transmitted, and how events are categorized prior to their transmission.

254. The Tracking Technologies constitute "devices" within the meaning of 18 U.S.C. § 2510(5).

255. Hims & Hers failed to disclose its use of Tracking Technologies to specifically track and automatically and simultaneously transmit Plaintiffs' and Nationwide Privacy Class Members' communications with Hims & Hers to undisclosed third parties.

256. The Tracking Technologies are designed such that they transmit a website or mobile application user's actions and communications contemporaneously as the user initiates each communication. As a result, the communications were intercepted in transit to the intended recipient—Hims & Hers—before reaching Hims & Hers's server.

257. The third-party advertising companies that make these Tracking Technologies are not parties to Plaintiffs' and Nationwide Privacy Class Members' communications with Hims & Hers.

258. As demonstrated herein, Hims & Hers violated ECPA by aiding and permitting third parties to intercept and receive its users' online communications in real time as they were made via the Hims & Hers Platform, and by then using these intercepted communications for its own analytics and advertising. Importantly, Meta, Google, and Snap would not have intercepted or received the contents of these communications (or even had access to them) but for Hims & Hers's actions and incorporations of the Tracking Technologies into the Hims & Hers Platform.

259. In aiding and permitting third parties to intercept its users' online communications, Hims & Hers had a purpose that was tortious. The unauthorized disclosure of private communications to profit from the information is tortious in and of itself. Hims & Hers

intentionally committed a tortious act by disclosing private communications to third parties, allowing them to record individually identifiable health information without authorization to do so, and associating the content of Plaintiffs' and Nationwide Privacy Class Members' communications in a manner that exceeds what Hims & Hers represented to Plaintiffs and Nationwide Privacy Class Members.

260. In aiding and permitting third parties to intercept its users' communications, Hims & Hers had a purpose that was designed to violate state and federal constitutional and statutory provisions including:

A. A knowing intrusion upon Plaintiffs' and Nationwide Privacy Class Members' seclusion;

B. California Confidentiality of Medical Information Act;

C. California Invasion of Privacy Act ("CIPA"); and

D. Various state consumer protection statutes, including but not limited to the California Unfair Competition Law.

261. Plaintiffs and Nationwide Privacy Class Members seek appropriate equitable or declaratory relief, including injunctive relief; actual damages and any profits made by Hims & Hers as a result of its violations or the appropriate statutory measure of damages; punitive damages in an amount to be determined by a jury; and reasonable attorney's fee and other litigation costs reasonably incurred pursuant to 18 U.S.C. § 2520.

262. This includes monetary damages for the greater of (i) the sum of the actual damages suffered by the Plaintiffs and any profits made by Hims & Hers as a result of the violation, or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

## SECOND CLAIM FOR RELIEF
**Violation of Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On Behalf of All Plaintiffs and the Nationwide Privacy Class)**

263. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

264. A plaintiff asserting claims for intrusion upon seclusion must plead (1) that the defendant intentionally intruded into a place, conversation, or matter as to which plaintiff has a reasonable expectation of privacy; and (2) that the intrusion was highly offensive to a reasonable person.

265. Hims & Hers's disclosure of Plaintiffs' and Class Members' sensitive data, including PHI to third parties like the Advertising and Analytics Companies constitutes an intentional intrusion upon Plaintiffs' and Class Members' solitude or seclusion.

266. Plaintiffs and Class Members had a reasonable expectation of privacy in the health information and other personal data that Hims & Hers disclosed to third parties. Plaintiffs' health information and other interactions with the Hims & Hers Platform are inherently sensitive in nature. Plaintiffs and Class Members reasonably expected this information would remain private and confidential and would not be disclosed to third parties without their consent.

267. This expectation is especially heightened given Hims & Hers's consistent representations to users that this information would be safeguarded and not disclosed to third parties like Meta, Google, Snap, and other third parties.

268. Given Hims & Hers's representations, and the nature of the data Hims & Hers received, Plaintiffs and Class Members had a reasonable expectation of privacy in their data relating to their use of the Hims & Hers Platform and expected this information would not be disclosed.

269. Plaintiffs and Class Members did not consent to, authorize, or know about Hims & Hers's intrusion at the time it occurred. Accordingly, Plaintiffs and Class Members never agreed that Hims & Hers could disclose their data to third parties.

270. The surreptitious disclosure of sensitive data, including PHI from millions of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that the overwhelming majority of

Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is collected or shared.

271. The offensiveness of this conduct is all the more apparent because Hims & Hers's disclosure of this information was conducted in secret in a manner that Plaintiffs and Class Members would be unable to detect through the incorporation of highly technical SDKs and pixels that was contrary to the actual representations made by Hims & Hers.

272. As a result of Hims & Hers's actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

273. Plaintiffs and Class Members have been damaged as a direct and proximate result of Hims & Hers's invasion of their privacy and are entitled to just compensation, including monetary damages.

274. Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Hims & Hers as a result of its intrusions upon Plaintiffs' and Class Members' privacy.

275. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Hims & Hers's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Hims & Hers from engaging in such conduct in the future.

276. Plaintiffs also seek such other relief as the Court may deem just and proper.

## **<u>THIRD CLAIM FOR RELIEF</u>**
## **Article I, Section 1 of the California Constitution (Invasion of Privacy)**
## **(On behalf of Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy Subclass)**

277. Plaintiffs Pearson, Zhu, Smith, and Cannon re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

278. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and

liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

279. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

280. The right to privacy in California's Constitution creates a right of action against private and government entities.

281. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and private data, including their health information, pursuant to Article I, § 1 of the California Constitution.

282. The identifiable and private information Hims & Hers disclosed to third parties without Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' consent was used, among other things, for targeted advertising purposes. The manner in which Hims & Hers disclosed this information defeated established privacy mechanisms, including the ECPA, CMIA, and HIPAA, and social norms.

283. This conduct constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person. Reasonable individuals do not expect that there are third parties intercepting their PHI, let alone using it for profit.

284. Hims & Hers's conduct violated the privacy of hundreds of thousands of California Privacy Subclass Members, including Plaintiffs Pearson, Zhu, Smith, and Cannon. Hims & Hers did not have consent to disclose this information.

285. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members seek damages to compensate the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Hims & Hers as a result of its intrusion upon seclusion.

286. Hims & Hers's conduct was willful, knowing, and carried out with a conscious disregard for Plaintiffs' and California Privacy Subclass Members' rights. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members are entitled to punitive and exemplary damages.

287. Plaintiffs and California Privacy Subclass Members also seek any other relief the Court may deem just and proper.

**FOURTH CLAIM FOR RELIEF**
**Violation of California Confidentiality of Medical Information Act ("CMIA")**
**Cal. Civil Code Section 56.06**
**(On Behalf of Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy Subclass)**

288. Plaintiffs Pearson, Zhu, Smith, and Cannon re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

289. Hims & Hers is a provider of health care under Cal. Civ. Code Section 56.06, subdivisions (a) and (b), because the Hims & Hers Platform maintains medical information and offers software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information or make the information available to a health care provider, or for the diagnosis, treatment, or management of a medical condition.

290. Hims & Hers is also a provider of health care under Cal. Civ. Code Section 56.06, subdivisions (d) and (e) because it provides mental health digital services to consumers for the purpose of diagnosis, treatment, and management and, separately, reproductive or sexual health digital services for the same purpose.

291. Hims & Hers is therefore subject to the requirements of the CMIA and obligated under Section 56.06 subdivision (e) to maintain the same standards of confidentiality required of a provider of health care with respect to medical information that it maintains on behalf of users.

292. The CMIA defines medical information to mean any "individually identifiable information" in possession of or derived from "a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical

condition, or treatment." As explained above, the information Hims & Hers maintained and disclosed is medical information because it is identifiable information relating to patients' medical histories, conditions, treatments, and/or prescriptions.

293. Hims & Hers violated Cal. Civ. Code § 56.06(e) because it did not maintain the confidentiality of users' medical information. Hims & Hers disclosed Plaintiffs' and Class Members' medical information to third parties, including the Advertising and Analytics Companies without consent, including information concerning medications they were taking or were prescribed.

294. Hims & Hers shared this identifiable information with third parties, including Meta, Google, Snap, and other third parties whose primary business includes selling advertisements, analytics, or other insights based on the data they obtain about individuals, and using such data to improve their products, services, and algorithms.

295. Hims & Hers knowingly and willfully disclosed medical information without consent to Advertising and Analytics Companies for financial gain. Namely, to sell more products, advertise, obtain analytics, and improve the Hims & Hers Platform, in violation of Cal. Civ. Code § 56.06(e). Hims & Hers's conduct was knowing and willful because it was aware that the Advertising and Analytics Companies would obtain all user data input while using its sites, yet intentionally embedded Advertising and Analytics Companies' Tracking Technologies anyway.

296. At the very least, Hims & Hers negligently disclosed medical information to Advertising and Analytics Companies in violation of Cal. Civ. Code § 56.06(e).

297. Accordingly, Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members are entitled to: (1) damages of $1,000 per violation; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to Cal. Civ. Code § 56.36(c); and reasonable attorneys' fees and other litigation costs reasonably incurred.

**FIFTH CLAIM FOR RELIEF**
**Violation of CMIA**
**Cal. Civil Code Section 56.101**
**(On Behalf of Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy Subclass)**

298. Plaintiffs Pearson, Zhu, Smith, and Cannon re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

299. Cal. Civ. Code § 56.101 (a) requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

300. Any health care provider who "negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to remedies and penalties provided under subdivisions (b) and (c) of Section 56.36[.]"

301. Hims & Hers is a provider of health care who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information.

302. Hims & Hers failed to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information contained therein because it disclosed Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' medical information, including information concerning medications they were taking or were prescribed, to third parties, including Advertising and Analytics Companies.

303. Hims & Hers's failure to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information was, at the least, negligent and violates Cal. Civ. Code § 56.101 (a).

304. Accordingly, Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members are entitled to: (1) damages of $1,000 per violation; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to Cal. Civ. Code § 56.36(c); and (4) reasonable attorneys' fees and other litigation costs reasonably incurred.

**<u>SIXTH CLAIM FOR RELIEF</u>**
**Violation of CMIA**
**Cal. Civil Code Section 56.10**
**(On Behalf of Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy Subclass)**

305. Plaintiffs Pearson, Zhu, Smith, and Cannon re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

306. Cal. Civ. Code § 56.10 (a) prohibits a health care provider from disclosing medical information without first obtaining an authorization, unless a statutory exception applies.

307. Hims & Hers disclosed medical information without first obtaining authorization when it disclosed Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' health data, including PHI, to third parties, including the Advertising and Analytics Companies. No statutory exception applies.

308. Hims & Hers knowingly and willfully disclosed medical information without consent to Advertising and Analytics Companies for financial gain. Namely, to market and advertise its services, or to allow others to market and advertise its services, in violation of Cal. Civ. Code § 56.10, subdivision (a).

309. At the very least, Hims & Hers negligently disclosed medical information in violation of Cal. Civ. Code § 56.10, subdivision (a) through the unauthorized disclosure of Plaintiffs' and Class Members' sensitive medical information.

310. Accordingly, Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members are entitled to: (1) damages of $1,000 per violation; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to Cal. Civ. Code § 56.35; and (4) reasonable attorneys' fees and other litigation costs reasonably incurred.

**SEVENTH CLAIM FOR RELIEF**
**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code Section 631**
**(On Behalf of Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy Subclass)**

311. Plaintiffs Pearson, Zhu, Smith, and Cannon re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

312. The California Legislature enacted the CIPA, Cal. Penal Code §§ 630, *et seq*., finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

313. Cal. Penal Code § 631 imposes liability on any person who "by means of any machine, instrument, contrivance, or in any other manner" (1) "intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [the state of California]," (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

314. Hims & Hers is a person for purposes of Section 631.

315. The Tracking Technologies and Plaintiffs' and California Privacy Subclass Members' computers and mobile devices are a "machine, instrument, contrivance, or . . . other manner" under Section 631.

316. Under CIPA, a defendant must show it had the consent of all parties to a communication.

317. At all relevant times, Hims & Hers aided, employed, and agreed with, third parties, including at least Meta, Google, and Snap to track and intercept Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' internet communications while accessing the Hims & Hers Platform. These communications were transmitted to and intercepted by third parties during the communication and without the knowledge, authorization, or consent of Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members.

318. Hims & Hers intentionally inserted an electronic listening device onto Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' web browsers and devices that, without their knowledge and consent, tracked, intercepted, and transmitted the substance of their confidential communications with Hims & Hers to third parties, including Meta, Google, and Snap—who constitute "persons" within the meaning of the statute.

319. Hims & Hers willingly facilitated third parties' interception and collection of Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' PHI by embedding the Tracking Technologies on the Hims & Hers Platform. Hims & Hers has full control over the Tracking Technologies, including which webpages contain them, what information is tracked and transmitted, and how events are categorized prior to their transmission.

320. Hims & Hers failed to disclose its use of the Tracking Technologies to specifically track and automatically and simultaneously transmit Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' communications with Hims & Hers to undisclosed third parties.

321. The Tracking Technologies are designed such that they capture and transmit a copy of website or mobile application user's actions and communications contemporaneously with the user's initiation of each communication, such that the interception and transmission to the third party happens while the communication is in transit between Plaintiffs and Hims & Hers. These

third parties immediately act on the communications in real time. As a result, the communications were intercepted in transit to the intended recipient—Hims & Hers—before reaching Hims & Hers's server.

322. As demonstrated above, Hims & Hers violated CIPA § 631 by aiding in and permitting third parties to intercept and receive its users' online communications in real time as they were made via the Hims & Hers Platform. Importantly, Meta, Google, and Snap, and other unauthorized third parties would not have been able to intercept or receive the contents of these communications but for Hims & Hers's actions and incorporations of the Tracking Technologies into the Hims & Hers Platform.

323. By disclosing Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' PHI, Hims & Hers violated their statutorily protected right to privacy.

324. As a result of the above violations and pursuant to CIPA § 637.2, Hims & Hers is liable to Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members for treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

**EIGHTH CLAIM FOR RELIEF**
**Violation of CIPA**
**Cal. Penal Code Section 632**
**(On Behalf of Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy Subclass)**

325. Plaintiffs Pearson, Zhu, Smith, and Cannon re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication." Section 632 defines "confidential communication" as "any

communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

326. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' communications to Hims & Hers, including their PHI, were confidential communications for purposes of § 632, because they had an objectively reasonable expectation of privacy in this data.

327. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members expected their communications to be confined to Hims & Hers in part due to the protected nature of the information at issue. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members did not expect Meta, Google, and Snap, or any third party to secretly eavesdrop upon or record this confidential information and their communications.

328. The Tracking Technologies are all electronic amplifying or recording devices for purposes of CIPA Section 632.

329. Hims & Hers contemporaneously recorded and eavesdropped on Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members through electronic amplifying or recording devices, i.e., by using Meta, Google, and Snap's Tracking Technologies, in violation of Section 632 of CIPA.

330. At no time did Plaintiffs Pearson, Zhu, Smith, and Cannon or California Privacy Subclass Members consent to this conduct, nor could they reasonably expect that their communications would be overheard or recorded by third parties.

331. Meta, Google, and Snap each utilized Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' PHI for their own purposes, including for targeted advertising.

332. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members seek statutory damages in accordance with Section 637.2(a), which provides for the

greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

333. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members have also suffered irreparable injury from these unauthorized acts. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' sensitive data has been collected, viewed, accessed, and stored by Hims & Hers, and third parties, including, Meta, Google, and Snap, and has not been destroyed. Due to the continuing threat of such injury, Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members have no adequate remedy at law. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members are accordingly entitled to injunctive relief.

## NINTH CLAIM FOR RELIEF
**California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code Sections 638.50 & 638.51**
**(On behalf of Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy Subclass)**

334. Plaintiffs Pearson, Zhu, Smith, and Cannon re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

335. CIPA § 638.50(b) defines a "pen register" as a "device or process" that "records or decodes dialing, routing, addressing, or signaling information" that is "transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

336. Separately, CIPA § 638.50(c) defines a "[t]rap and trace device" as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

337. CIPA § 638.51 prohibits a person from installing either a pen register or trap and trace device without a court order.

338. Hims & Hers is a person under CIPA § 638.51.

339. Hims & Hers implemented and installed the Tracking Technologies—which are pen registers and/or trap and trace devices—on Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' devices and browsers.

340. These Tracking Technologies captured "routing, addressing, or signaling information" because they intercepted unique user and device identifiers, including cookies used for purposes of identification.

341. Hims & Hers was not authorized by any court order to use a pen register or trap and trace device to record or capture Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' routing, addressing, or signaling information as alleged herein.

342. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members did not consent to Hims & Hers's installation of a pen register or trap and trace device on their devices or browsers.

343. Hims & Hers captured Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' sensitive PHI.

344. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members have been harmed as a result of Hims & Hers's conduct.

345. Hims & Hers did not have authorization to use pen registers and/or trap and trace devices to surveil and identify Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members or other routing, addressing, and signaling information revealing who the intended recipients of their communications were.

346. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members face an imminent threat of continued injury, as this data continues to be stored and used, including by third parties providing the Tracking Technology alleged above, such that Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members have no adequate remedy at law.

347. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members seek statutory damages in accordance with Section 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the California Privacy Subclass Members in an amount to be proven at trial, as well as injunctive or other equitable relief.

**TENTH CLAIM FOR RELIEF**
**Comprehensive Computer Data Access and Fraud Act ("CDAFA")**
**Cal. Penal Code Section 502**
**(On behalf of Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy Subclass)**

348. Plaintiffs Pearson, Zhu, Smith, and Cannon re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

349. The California Legislature enacted CDAFA to "expand the degree of protection afforded. . . from tampering, interference, damage, and unauthorized access to [(including the extraction of data from)] lawfully created computer data and computer systems," finding and declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals . . ." Cal. Penal Code § 502(a).

350. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' devices on which Hims & Hers installed the third-party Tracking Technologies, including their computers, smartphones, and tablets, constitute "computer systems" within the meaning of the CDAFA. *Id.* § 502(b)(5).

351. The data that Hims & Hers accessed and disclosed from Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' devices constitutes "Data" within the meaning of the CDAFA. *Id.* § 502(b)(8).

352. Hims & Hers violated Section 502(c)(1) of the CDAFA by knowingly accessing without permission Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' devices and placing pixels, cookies, and other Tracking Technologies on their devices and local storage, in order to wrongfully obtain, disclose, and use their personal data in violation of users' reasonable expectations of privacy in their devices and data.

353. Hims & Hers violated Section 502(c)(2) of the CDAFA by knowingly and without permission taking, copying, and making use of Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' unique identifiers and other personal data from their devices.

354. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' device functionalities, device systems, device networks, and browsers constitute "computer services" within the meaning of the CDAFA. Hims & Hers violated Section 502(c)(3) by knowingly and without permission causing them to be used and accessed by third parties through the third-party Tracking Technology and identifying mechanisms incorporated on the Hims & Hers Platform.

355. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' devices, device systems, device networks, and browsers constitute "computer, computer system, or computer network" within the meaning of the CDAFA. Hims & Hers violated § 502(c)(7) by knowingly and without permission causing those devices, device systems, device networks, and browsers to be accessed through third-party Tracking Technology and identifying mechanisms incorporated on the Hims & Hers Platform.

356. Hims & Hers violated Sections 502(c)(6) and (c)(13) of the CDAFA by knowingly, and without permission from Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members, providing and/or assisting in providing advertisers, including Meta, Google, and Snap, the ability to access Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members' devices, device systems, device networks, and browsers via the Tracking Technology and identifying mechanisms incorporated on Hims & Hers Platform.

357. Under Section 502(b)(12) of the CDAFA, a “Computer contaminant” is defined as “any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information.” The Tracking Technology Hims & Hers incorporated on the Hims & Hers Platform constitutes computer contaminants as defined by Section 502(b)(12) of the CDAFA. Hims & Hers violated Section 502(c)(8) by knowingly and without permission introducing computer contaminants, including Google’s Tracking Technology, on Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members’ devices, device systems, device networks, and browsers, which intercepted and disclosed their personal and health data to third parties.

358. As described *supra*, the Tracking Technology is deeply hidden on the Hims & Hers Platform; Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members had no way to remove it or opt out of its functionality.

359. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members suffered damage and loss as a result of Hims & Hers’s conduct. Hims & Hers’s practices have deprived them of control over their valuable property (namely, their personal health data), the ability to receive compensation for that data, and the ability to withhold their data for sale.

360. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members suffered harm because Hims & Hers unjustly profited from the PHI Hims & Hers disclosed by using it for its own business purposes, like targeted advertising.

361. Hims & Hers’s use of Tracking Technology has caused harm to Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members by taking up additional bandwidth, CPU time, data usage, and power consumption in their devices. Hims & Hers’s practices have also violated Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members’ private interests by collecting and disclosing their PHI.

362. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members seek compensatory damages in accordance with CDAFA § 502(e)(1), in an amount to be proven at trial, and injunctive or other equitable relief.

363. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members have also suffered irreparable and incalculable harm and injuries from Hims & Hers's violations. The harm will continue unless Hims & Hers is enjoined from further violations of this section. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members have no adequate remedy at law.

364. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Hims & Hers's violations were willful and, upon information and belief, Hims & Hers is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Privacy Subclass Members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

## ELEVENTH CLAIM FOR RELIEF
**Violation of the California Consumers Legal Remedies Act ("CLRA")**
**Cal. Civ. Code Sections 1750, *et seq*.**
**(On Behalf of Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy and Subscription Subclasses)**

365. Plaintiffs Pearson, Zhu, Smith, and Cannon re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

366. Hims & Hers engaged in "unfair methods of competition and unfair or deceptive acts . . . in a transaction . . . that result[ed] . . . in the sale . . . of goods" to Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy and Subscription Subclass Members in violation of Cal. Civ. Code § 1750 and Cal. Civ. Code § 1770(a)(5), (7), (9), (14), (16).

367. For instance, Hims & Hers made advertising and cancellation representations, as described above in the Factual Background sections titled "Hims & Hers Misleadingly Promises the Opportunity to Consult with a Medical Provider Regarding Treatment," "Hims & Hers Fails to

Clearly and Conspicuously Disclose If and When Consumers Will Be Charged and Subscribed," and "Hims & Hers Does Not Provide Simple Mechanisms for Consumers to Cancel Subscriptions," as well as representations that it would protect Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy and Subscription Subclass Members' privacy interests, including its privacy policy's promise that "we do not use Protected Information for advertising or marketing."

368. Hims & Hers Medical Group's Notice of Privacy Practices likewise promised that "[o]ther than expressly provided herein, any other uses or disclosures of your medical information will require your specific written authorization."

369. Hims & Hers also represented on its website, in response to the question "How does Hims ensure patient privacy?" that "medical records and sensitive information are only accessed by the medical providers managing your care," and advertised that it provides a "100% online, private, and secure process."

370. Hims & Hers made these representations with no intention of living up to these representations. Contrary to these representations, Hims & Hers disclosed and allowed third parties to intercept Hims & Hers users' sensitive data, including health data and PHI.

371. Further, Hims & Hers failed to disclose it secretly shared, used, and allowed third parties to intercept Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy and Subscription Subclass Members' PHI.

372. Hims & Hers was under a duty to disclose this information given its relationship with Hims & Hers users and its exclusive knowledge of its misconduct (e.g., the Tracking Technology incorporated on the Hims & Hers Platform, the data it disclosed and allowed third parties to intercept through this technology, and how it and third parties used this data).

373. Hims & Hers further violated the CLRA through its deceptive subscription enrollment, billing, and cancellation practices. Hims & Hers represented, through statements including "Due Now - $0," "Pay $0 today," and "you will only be charged if prescribed," that a consumer submitting an Intake Flow for review by a medical provider was not agreeing to pay any

money for, or subscribe to, a recommended treatment at the time of submission, in violation of Cal. Civ. Code § 1770(a)(5), (9), and (14). In fact, Hims & Hers charged consumers, including Plaintiff Smith and Cannon, and enrolled them in automatically-renewing subscriptions as soon as a provider reviewed the Intake Flow, without affording consumers a meaningful opportunity to confirm their consent.

374. Hims & Hers further failed to clearly and conspicuously disclose the dates on which recurring refill charges would be processed, and employed a multi-step cancellation flow that never used the word “cancel” and required completion of retention-offer screens before accepting a cancellation request — representing that the transaction conferred rights and obligations that it did not, and imposing practical obstacles to cancellation amounting to unconscionable conduct in connection with the transaction, in violation of Cal. Civ. Code § 1770(a)(14) and (19).

375. Plaintiff Smith and Cannon relied on these representations and would not have submitted their Intake Flow, or would not have been charged on the terms Hims & Hers actually applied, had Hims & Hers's representations regarding charging, billing, and cancellation been true.

376. Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy and Subscription Subclass Members would not have purchased, or would have paid significantly less for, Hims & Hers’s services and products had Hims & Hers not made these false representations. Hims & Hers profited directly from these sales, including through payment for these services and products, and from the data disclosed and intercepted.

377. Plaintiffs Pearson, Zhu, Smith, and Cannon, individually and on behalf of the California Privacy and Subscription Subclass, seek an injunction requiring Hims & Hers to (i) cease from its deceptive marketing and cancellation practices and (ii) obtain consent prior to disclosing and otherwise using their sensitive personal data and to delete the data already collected, and any other relief which the court deems proper.

378. Pursuant to Cal. Civ. Code § 1782(a), on August 14, 2026, Plaintiffs mailed Hims & Hers notice of its alleged violations of the CLRA by USPS Certified Mail Return Receipt

Requested. If Hims & Hers fails to provide appropriate relief for its violations of the CLRA within 30 days, Plaintiffs Pearson, Zhu, Smith, and Cannon will seek monetary damages under the CLRA.

379. In accordance with Cal. Civ. Code § 1780(d), Plaintiffs' Pearson, Zhu, Smith, and Cannon' CLRA venue declarations are attached hereto.

**TWELFTH CLAIM FOR RELIEF**
**Violations of Cal. Bus. & Prof. Code Sections 17200, *et seq*.**
**(On Behalf of Plaintiffs Pearson, Zhu, Smith, Cannon and the California Privacy and Subscription Subclasses)**

380. Plaintiffs Pearson, Zhu, Smith, and Cannon re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

381. Hims & Hers's business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*. ("UCL"), because, as alleged above, Hims & Hers violated the California common law and other federal and California statutes and causes of action described herein, including the ECPA; CIPA; FAL; CLRA; CMIA; CDAFA; Section 5 of the FTC Act; ROSCA, 15 U.S.C. § 8403; and California's ARL, Cal. Bus. & Prof. Code § 17600, *et seq.*

382. Hims & Hers's acts and practices are further "unlawful" because they violate California's Automatic Renewal Law, Cal. Bus. & Prof. Code § 17602, including by failing to present automatic renewal terms in a clear and conspicuous manner and in visual proximity to the request for consent, § 17602(a)(1); charging consumers for an automatic renewal without first obtaining affirmative consent to an agreement containing the automatic renewal terms, § 17602(a)(2); and failing to provide a simple, easily accessible mechanism for consumers to terminate their subscriptions without unnecessary additional steps, § 17602(d)–(f).

383. Hims & Hers's acts and practices are further "unlawful" because they violate the ROSCA, 15 U.S.C. § 8403, which prohibits charging consumers for a good or service sold through a negative option feature unless the seller clearly and conspicuously discloses all material terms before obtaining billing information, obtains the consumer's express informed consent before

charging, and provides a simple mechanism to stop recurring charges — each of which Hims & Hers failed to do, as alleged above.

384. Plaintiffs Smith and Cannon and the Subscription Subclass Members have suffered injury in fact and lost money or property as a result of Hims & Hers’s unfair competition, including amounts charged for subscriptions and refills that were not knowingly and validly authorized, and money paid for services Plaintiffs and Subclass Members would not have purchased, or would have paid less for, had Hims & Hers's representations been true

385. Hims & Hers’s business acts and practices are also “unfair” under the UCL. California has a strong public policy of protecting consumers’ privacy interests, including protecting consumers’ personal data. Hims & Hers violated this public policy by, among other things, disclosing and intercepting Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy and Subscription Subclass Members’ sensitive data, including PHI without consent.

386. Hims & Hers further engaged in unfair business practices because it made material misrepresentations and omissions concerning subscription, cancellation, and information that it assured users it would not share with third parties, which deceived and misled users of the Hims & Hers Platform.

387. Hims & Hers’s business acts and practices are also “unfair” in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm of Hims & Hers secretly disclosing, intercepting, and misusing Plaintiffs’ and Class Members’ sensitive personal data is significant, and there is no corresponding benefit resulting from such conduct. Finally, because Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy and Subscription Subclass Members were completely unaware of Hims & Hers’s conduct, they could not possibly have avoided the harm.

388. Hims & Hers’s business acts and practices are also “fraudulent” within the meaning of the UCL.

389. As alleged herein, Hims & Hers deceptively marketed the costs of its services as well as the ability to cancel subscriptions.

390. As alleged herein, Hims & Hers deceptively marketed that it would not share users' PHI with third parties.

391. Hims & Hers disclosed, and the Advertising and Analytics Companies intercepted, a large collection of sensitive personal data, including PHI, without disclosing this practice and therefore acted without users' knowledge or consent. Hims & Hers's business acts and practices were likely to, and did, deceive members of the public including Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy and Subscription Subclass Members into believing this data was private and would not be shared with third parties.

392. Hims & Hers assured users, in its privacy policy, that "we do not use Protected Information for advertising or marketing."

393. Hims & Hers did not disclose that it would share this data with third parties, including with Advertising and Analytics Companies.

394. Such information was not kept private, as Hims & Hers disclosed and allowed the Advertising and Analytics Companies to intercept this data.

395. Hims & Hers's violations were, and are, willful, deceptive, unfair, and unconscionable.

396. Had Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy and Subscription Subclass Members known their personal information, including health data and PHI, would be disclosed and intercepted, they would not have used or purchased, or would have paid significantly less for, Hims & Hers services and products.

397. Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy and Subscription Subclass Members have a property interest in their sensitive personal data. By surreptitiously disclosing and intercepting Plaintiffs Pearson, Zhu, Smith, and Cannon and the

California Privacy and Subscription Subclass Members' information, Hims & Hers has taken property from them without providing just or any compensation.

398. Health data objectively has value. Companies are willing to pay for this data, including the data disclosed to and intercepted by the Advertising and Analytics Companies. For instance, Pfizer annually pays approximately $12 million to purchase health data from various sources.

399. This data also objectively has value to consumers. According to the annual Financial Trust Index Survey, conducted by the University of Chicago's Booth School of Business and Northwestern University's Kellogg School of Management, which interviewed more than 1,000 Americans, 93 percent would not share their health data with a digital platform for free. Half of the survey respondents would only share their data for $100,000 or more, and 22 percent would only share their data if they received between $1,000 and $100,000.

400. By unlawfully disclosing and intercepting this data, Hims & Hers has taken money or property from Plaintiffs Pearson, Zhu, Smith, and Cannon and the California Privacy and Subscription Subclass Members.

401. To the extent this Court finds that Plaintiffs and the Classes have an adequate remedy at law for any of the conduct alleged in this Claim, including through the CLRA claim alleged above, Plaintiffs plead this Claim for equitable relief in the alternative and allege that legal remedies are inadequate to redress the full scope of Hims & Hers's unlawful, unfair, and fraudulent conduct, including its ongoing, uncorrected data-sharing, subscription, and cancellation practices, for which injunctive relief is necessary and for which no adequate remedy at law exists. *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020); *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308 (9th Cir. 2022).

402. For these reasons, Plaintiffs Pearson, Zhu, Smith, and Cannon seek at least restitution, disgorgement, and other equitable relief on behalf of themselves and California Privacy and Subscription Subclass Members as a result of Hims & Hers's violations of the UCL.

**<u>THIRTEENTH CLAIM FOR RELIEF</u>**
**Violations of California's False Advertising Law ("FAL")**
**Cal. Business and Professions Code Section 17500, *et seq.***
**(On Behalf of Plaintiffs Pearson, Zhu, Smith, Cannon and the California Subscription Subclass)**

403. Plaintiffs Pearson, Zhu, Smith, and Cannon re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

404. Hims & Hers has engaged in business acts or practices as alleged that constitute violations of the California Business and Professions Code § 17500, *et seq.*, by making or disseminating, or causing to be made or disseminated, false or misleading statements to Plaintiffs Pearson, Zhu, Smith, and Cannon with the intent to induce them to use its website or applications when Hims & Hers knew, or by the exercise of reasonable care should have known, that the statements were false or misleading.

405. Hims & Hers knew, or by the exercise of reasonable care should have known, that these statements were untrue or misleading, given the years of consumer complaints it received directly and through the Better Business Bureau, Trustpilot, and the Apple App Store, and the FTC's Civil Investigative Demand issued to Hims & Hers in October 2023.

406. Hims & Hers made one or more of the following false or misleading statements, promises, omissions, and representations to Plaintiffs Pearson, Zhu, Smith, and Cannon and California Subscription Subclass Members:

A. A consumer would have the opportunity to consult with a medical provider regarding their treatment recommendation when, in fact, many consumers were already charged for and enrolled in a subscription before they even learned what treatment the provider had recommended and were never able to consult with a provider;

B. A consumer submitting an Intake Flow for review by a medical provider was not agreeing to pay any money for, or to subscribe to, the recommended treatment at the time they submitted the Intake Flow for review when, in fact, Hims & Hers charged consumers and considered them to have agreed to subscriptions for recommended treatment just because they had completed the Intake Flow;

C. A consumer submitting to Hims & Hers an Intake Flow for review by a medical provider would only be charged and subscribed after they confirmed their consent to the provider's treatment recommendation when, in fact, most consumers were not given a real opportunity to confirm and consent to the recommended treatments before they were charged; and

D. A consumer who provided information, including health information, to Hims & Hers would have that information kept private, that Hims & Hers would be discreet with information consumers provided to it, and that Hims & Hers would not disclose consumers' health information to third parties when, in fact, it shared Plaintiffs Pearson, Zhu, Smith, and Cannon and California Subscription Subclass Members' sensitive PHI with the third-party Advertising and Analytics Companies without their consent.

407. Each of these misrepresentations and/or omissions described above was material and likely to deceive Plaintiffs Pearson, Zhu, Smith, and Cannon and California Subscription Subclass Members.

408. Plaintiff Smith and Cannon specifically viewed and relied on Hims & Hers's representation, displayed at checkout, that $0 was due that day and that he would not be charged before being evaluated by a medical provider, when he completed his Intake Flow and provided his billing information in or around 2023. As a direct and proximate result of Hims & Hers's false advertising, Plaintiff Smith and Cannon suffered economic injury, including by being charged for treatment on terms he did not agree to and would not have agreed to had Hims & Hers's advertising been truthful.

409. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Subscription Subclass Members seek an injunction requiring Hims & Hers to cease the false and misleading advertising practices alleged herein pursuant to the FAL.

410. Plaintiffs Pearson, Zhu, Smith, and Cannon and California Subscription Subclass

Members seek all other relief available under California law, including restitution and such other equitable relief as the Court deems just and proper.

**FOURTEENTH CLAIM FOR RELIEF**
***Negligence Per Se***
**(On Behalf of All Plaintiffs and the Nationwide Privacy and Subscription Classes)**

411. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

412. Hims & Hers owed Plaintiffs and Class Members a common-law duty to exercise reasonable care in safeguarding their sensitive personal and health information and in fairly and accurately marketing, billing, and administering cancellations for its subscription services. That duty of care is particularized, for purposes of this Claim, by the standard of conduct set forth in Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1), which prohibits "unfair or deceptive acts or practices in or affecting commerce," as interpreted and enforced by the FTC with respect to Hims & Hers's privacy practices, its failure to disclose the sharing of health information with Advertising and Analytics Companies, and its deceptive intake and cancellation practices

413. In numerous instances, in connection with the advertising, marketing, promotion, or offering for sale of Hims & Hers's services offering online medical treatment and medical products, including prescription medications, Hims & Hers has represented, directly or indirectly, expressly or by implication that:

A. Sensitive health information provided by Plaintiffs and Class Members to Hims & Hers is only accessed by medical providers providing care;

B. Hims & Hers's services are private; and

C. Hims & Hers's services are discreet.

414. In fact, sensitive health information provided by Plaintiffs and Class Members to Hims & Hers has been shared with third-party Advertising and Analytics Companies; Hims & Hers's services have not been private; and Hims & Hers's services have not been discreet. This

fact would have been material to Plaintiffs and Class Members in deciding whether to enroll in the Hims & Hers Platforms.

415. In connection with the advertising, marketing, promotion, or offering for sale of Hims & Hers's services offering online medical treatment and medical products, including prescription medications, Hims & Hers has represented, directly or indirectly, expressly or by implication, that:

A. A consumer submitting an Intake Flow for review by a medical provider will be able to have a dialogue with the provider about the provider's treatment recommendation;

B. A consumer submitting an Intake Flow for review by a medical provider is not agreeing to pay any money for, or to subscribe to, the recommended treatment at the time they submit that Intake Flow for review; and

C. A consumer submitting an Intake Flow for review by a medical provider will only be charged and subscribed after they confirm their consent to the provider's treatment recommendation.

416. In fact, in numerous instances in which Hims & Hers has made the representations as described above, a consumer submitting an Intake Flow for review by a medical provider is not able to have a dialogue with the provider about the provider's treatment recommendation; a consumer submitting an Intake Flow for review by a medical provider is agreeing to pay money and to be subscribed as soon as their prescription is written, without an opportunity to avoid the charges; and a consumer submitting an Intake Flow for review by a medical provider does not have an opportunity to confirm their consent to the provider's treatment recommendation before being charged or subscribed.

417. Hims & Hers's misrepresentations violated Section 5 of the FTC Act.

418. Plaintiffs and Members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

419. Hims & Hers's violation of Section 5 of the FTC Act constitutes negligence *per se*.

420. Pursuant to Cal. Evid. Code § 669, a rebuttable presumption of negligence arises where a person violates a statute, the violation proximately causes injury of a kind the statute was designed to prevent, and the injured person was one of the class of persons the statute was designed to protect. Each of these elements is satisfied here: Hims & Hers violated Section 5 of the FTC Act, as alleged above; that violation proximately caused Plaintiffs and Class Members to be charged for services and to have their sensitive information disclosed without consent; the harm suffered is precisely the type of harm Section 5 was designed to prevent; and Plaintiffs and Class Members, as consumers, are within the class of persons Section 5 was intended to protect.

421. The harm that has occurred as a result of Hims & Hers's conduct is the type of harm that Section 5 of the FTC Act was intended to guard against.

422. As a direct and proximate result of Hims & Hers's negligence *per se*, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**FIFTEENTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of All Plaintiffs and the Nationwide Privacy and Subscription Classes)**

423. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

424. Hims & Hers received benefits from Plaintiffs and Class Members and unjustly retained those benefits at their expense.

425. Hims & Hers received benefits from Plaintiffs and Class Members in the form of (i) the subscription fees Plaintiffs and Class Members paid Hims & Hers for services and (ii) the Plaintiffs' and Class Members' highly valuable data, including health information, that Hims & Hers wrongfully disclosed and intercepted from Plaintiffs and Class Members without their authorization and proper compensation.

426. Hims & Hers received monetary payments from Plaintiffs and Class Members in the form of subscription fees it collected from them.

427. Hims & Hers disclosed, intercepted, stored, and used this data for their own gain, providing Hims & Hers with economic, intangible, and other benefits, including highly valuable data for analytics, advertising, and improvement of their platforms, algorithms, and advertising services.

428. Hims & Hers deceptively marketed its subscription fees for its services, as well as its cancellation policies.

429. Had Plaintiffs known of Hims & Hers's misconduct, they would not have provided any of their data to Hims & Hers and/or would not have paid for Hims & Hers services.

430. Hims & Hers unjustly retained these benefits at the expense of Plaintiffs and Class Members because Hims & Hers's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

431. The benefits that Hims & Hers derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles in California and every other state for Hims & Hers to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

432. Hims & Hers should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Hims & Hers received, and such other relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the proposed Classes respectfully request that the Court enter an order:

A. Certifying the Classes and Subclasses, and appointing Plaintiffs as the Classes' representatives and their counsel as Class Counsel;

B. Finding that Hims & Hers's conduct was unlawful, as alleged herein;

C. Awarding declaratory relief against Hims & Hers;

D. Awarding such injunctive and other equitable relief as the Court deems just and proper, including Defendant ceasing from its deceptive advertising and marketing practices and the sharing of Plaintiffs' PHI;

E. Awarding Plaintiffs and the Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

F. Awarding Plaintiffs and the Class Members pre-judgment and post-judgment interest;

G. Awarding Plaintiffs and the Class Members reasonable attorneys' fees, costs, and expenses; and

H. Granting such other relief as the Court deems just and proper.

Dated: August 14, 2026

/s/ *Amber L. Schubert*
Robert C. Schubert #62684
Willem F. Jonckheer #178748
Amber L. Schubert #278696
Sonum Dixit #353395
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law
aschubert@sjk.law
sdixit@sjk.law

Christian Levis (*pro hac vice* forthcoming)
Amanda Fiorilla (*pro hac vice* forthcoming)
Patricia Zapata Latzer (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
platzer@lowey.com

Anthony M. Christina (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Tel: (215) 399-4770
Fax: (914) 997-0035
achristina@lowey.com

*Counsel for Plaintiffs and the Class*